1    UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2             NORTHERN DIVISION

3
     UNITED STATES OF AMERICA
4
     VS.                 CRIMINAL NO. 3:14-cr-00111-HTW-FKB
5
     CHRISTOPHER B. EPPS, ET AL.
6

7    AND

8    UNITED STATES OF AMERICA

9
     VS.                 CRIMINAL NO. 3:15-cr-69-HTW-FKB
10
     SAM WAGGONER
11

12

13

14                    EVIDENTIARY HEARING

15

16        BEFORE THE HONORABLE HENRY T. WINGATE
             UNITED STATES DISTRICT JUDGE
17                 JUNE 9, 2016
                JACKSON, MISSISSIPPI
18

19

20   APPEARANCES:

21   FOR THE GOVERNMENT:    MR. DARREN LaMARCA

22   FOR DEFENDANT EPPS:    MR. JOHN COLETTE
                            MR. SHERWOOD COLETTE
23
     FOR DEFENDANT McCRORY:  MR. CARLOS TANNER
24

25   FOR DEFENDANT WAGGONER:  MR. NICHOLAS R. BAIN

```
 1   REPORTED BY:   BRENDA D. WOLVERTON, RPR, CRR, FCRR

 2                  Mississippi CSR #1139

 3   _____

 4                  501 E. Court Street, Ste. 2.500
                    Jackson, Mississippi   39201
 5                        (601) 608-4186

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Good morning.  First of all, let me

2     announce that we were supposed to start this morning at 9:30.

3     We are starting late because I took up another matter this

4     morning.  This matter was on the schedule for yesterday, some

5     civil matters, and so yesterday afternoon I took up some

6     hearings in some civil cases.  The hearings ended at about

7     5:00 o'clock except for one hearing, and so I took that hearing

8     anyway at 5:00 o'clock to try to conclude it because those

9     parties had been scheduled and they had waited patiently for

10    their turn.

11         The case before them had more issues than we

12    anticipated, so we didn't start that hearing until 5:00 o'clock

13    last night.  We went until 7:30 last night, and then at 7:30 I

14    recessed and advised the parties to come back this morning at

15    8:30 to complete their arguments hoping that we could finish up

16    in about an hour.

17         The arguments were substantial, and so it went over

18    the hour's timeframe and just concluded just a few moments ago.

19    But those parties had been patiently waiting for their

20    opportunity to make their arguments in this other civil case

21    and therefore I wanted to get to it as soon as I could.  So

22    that's why we are starting late because I heard those

23    arguments.  And now that I have finished those arguments, we

24    are now ready to proceed on this matter.

25         So let me turn to the prosecution, and call your case.

1          MR. LAMARCA:  Thank you, Your Honor.  Your Honor,
2     before the court is United States versus Christopher Epps and
3     Cecil McCrory.  This is in Criminal Number 3:14cr111 and also
4     present in a related case of U.S. versus Sam Waggoner, Criminal
5     No. 3:14cr69.  Mr. Waggoner is present, Your Honor, with his
6     attorney, Nick Bain, for the proceedings today.  And more
7     specifically with regard to Criminal No. 3:14cr11, Mr. Epps is
8     present with his attorney, John Colette.  In addition, he has
9     as cocounsel Sherwood Colette.  Mr. McCrory is present with his
10    attorney, Carlos Tanner, Your Honor, and we are here today for
11    an evidentiary hearing for the court to determine the net
12    benefit as to the contracts that were the subject of the
13    indictment as well as relevant conduct to that indictment
14    pending -- to which Mr. Epps and Mr. McCrory have pled guilty
15    at least as to the money laundering count in Count 23, being a
16    conspiracy, and then in addition with Mr. Epps pleading as to
17    failing to file or for filing a fraudulent tax return.  That
18    was charged in Count 44.  And the government is ready to
19    proceed with that evidentiary hearing.
20          THE COURT:  Now, will you introduce the other members
21    at your counsel table?
22          MR. LAMARCA:  Yes, Your Honor.  Seated immediately to
23    my left is Molly Blythe, a special agent with the FBI.
24          THE COURT:  Okay.
25          MR. LAMARCA:  And to her left is Pat Lemon.  He is an

Assistant United States Attorney working on this matter as well. And to his left is Tye Breedlove who is also a special agent with the FBI.

THE COURT: And these persons have been involved in this lawsuit all along, so the court knows them. And good morning to all of you.

MR. LEMON: Good morning, Your Honor.

THE COURT: Thank you. Let me turn over to the defense and have defense counsel introduce themselves to the record as well as their clients.

MR. COLETTE: Your Honor, John Colette appearing on behalf of Christopher Epps. Sherwood Colette, cocounsel. Kevin Massey is my law clerk, Your Honor, here to keep me straight on the law.

THE COURT: All right. And you are here with your client, Mr. Christopher Epps. And good morning again to you, Mr. Epps.

DEFENDANT EPPS: Good morning, Your Honor.

THE COURT: Next.

MR. BAIN: Good morning, Your Honor. Nick Bain appearing on behalf of Sam Waggoner, and Mr. Waggoner is with me today in court as well.

THE COURT: All right. And good morning to both of you. All right. And?

MR. TANNER: Good morning, Your Honor. Carlos Tanner

1   on behalf of Mr. Cecil McCrory.  Mr. McCrory is here with me
2   seated to my immediate right.
3       THE COURT:  And good morning to both of you.  Now,
4   Mr. Tanner, will you be participating in this hearing?
5       MR. TANNER:  Well, Your Honor, as the court -- if the
6   court recalls, at the last hearing where we appeared before
7   this court, on that particular day, that was the date -- I
8   don't have it offhand, but it was the date that was set for Mr.
9   Epps' sentencing.  At that sentencing, the government announced
10  that it had uncovered a number of contracts that were related
11  to Mr. Epps' sentencing and that needed to be produced to Mr.
12  Epps and his counsel and for which evidentiary hearings would
13  need to be held by Your Honor.
14      Well, Your Honor, at that time, the court asked the
15  parties that were parties to that hearing, particularly to the
16  prosecution, whether those matters would affect my client,
17  Mr. McCrory.  I was seated in the back of the courtroom.  The
18  court called me forward.  And, for that reason, I am present
19  and the court put me down as a party to the evidentiary
20  hearing.  And to the extent that any of these contracts do
21  affect my client, I would ask for an opportunity to
22  cross-examine anybody that attempts to put forth documents that
23  suggest some -- that affect my client in some negative way,
24  Your Honor.
25      THE COURT:  But now, at that last session, you advised

1    the court that your client is contemplating a withdrawal of his

2    plea.

3              MR. TANNER:  That's true, Your Honor.

4              THE COURT:  Is that still the same situation?

5              MR. TANNER:  That is still the same situation, Your

6    Honor.  As I indicated to the court at my first appearance, if

7    I can go back, Your Honor, I got involved in this case and was

8    retained by Mr. McCrory for the record after his guilty plea,

9    well after his guilty plea.  At that time, I was provided a

10   large number of compact discs and DVDs of evidence that the

11   government intended to use against Mr. McCrory and that were

12   used to effectuate his -- or get him to plead guilty.

13            Your Honor, I indicated to the court even though my

14   case, Mr. McCrory's case, was not before the court during the

15   last hearing, when the court called me forward, I did announce

16   without being questioned on the matter from the court, I wanted

17   to give the court as well as the government notice that I was

18   intending to file a motion and that I had been working on a

19   motion to withdraw my client's guilty plea.  At that time, I

20   told the court that I thought it would be a short time well

21   before now that I would get that motion filed.  I have still

22   been working on it.  And, as this court is well aware, one of

23   the factors that the court has to consider on making a

24   determination whether to permit my client to withdraw the

25   guilty plea, one of the factors is time.  And I believe I can

address that based on one of several trials that I have had or at least one trial that I have had and a number that have been set, two of which were continued on the morning of trial that I did not know that I was going to have to defend at the time I made that announcement to the court.

But I have never indicated to the government that I had changed my mind. I have never indicated to the court. And as I stand here today, I represent that Mr. McCrory is still expecting to file that motion to withdraw the guilty plea. And none of -- and the court -- when I raised that issue the last time, the court asked me while I had been working on that motion whether I had known anything of this notion that the government was intending to raise the loss amount from $300 million to $800 million. And I was careful to tell the court that I did not learn that. I learned that by surprise on the morning of Mr. Epps' last scheduled sentencing hearing. So that, in no way, had any bearing on whether I was working on or intended to file on behalf of my client a withdrawal of his guilty plea.

THE COURT: So when might you finish your pleading on your motion to withdraw?

MR. TANNER: Your Honor, I am trying to get that done within the next two weeks. I may be able to get it done before then. But part of the issue is this, Your Honor, and it did factor into my calculus to be sure on whether I thought that

1    that motion was ready to be filed.

2          The issue is when the government came to the court at

3    Mr. Epps' last hearing, it said that they had discovered all

4    these additional contracts to the tune of a half a billion

5    dollars.  Well, I think that speaks to the matter of whether

6    discovery was done properly at the point at which Mr. -- it

7    could not have been done properly at the time Mr. McCrory

8    entered a guilty plea.  And what I did not want to happen was

9    to have myself represent based on the discovery that I received

10   what was on those 77 discs that, for example, Mr. McCrory had

11   eight contracts that related to his conduct or that should

12   affect him or that impacted whether this court should deem him

13   to be guilty or not guilty such that he can make a claim of

14   innocence.

15         Well, if the government has 50 extra contracts that I

16   have not received, that I have not been able to review, then

17   that would certainly impact what I'm able to put in my motion.

18   And, you know, this kind of dovetails into part of what Mr.

19   Colette filed I think the day before yesterday or yesterday

20   morning.  He filed a motion to continue these proceedings

21   because the government had said that they had, at the last

22   hearing, already discovered these -- this vast number of

23   additional contracts.  Well, I didn't receive an additional

24   contract until Monday.  And at that time, I still didn't even

25   receive it; it was just the matter that I was asked to or

1  invited to participate in a meeting to go over these materials
2  on Monday morning of this week.
3        Well, I don't know what these contracts are.  I don't
4  know what they purport to be.  I did understand only then that
5  a large number of these contracts don't even affect
6  Mr. McCrory, have nothing to do with Mr. McCrory in the
7  government's perspective on the sentencing of Mr. McCrory.  The
8  problem is I believe those contracts, whether Mr. McCrory was a
9  party to them or consulted in them or anything else, I think
10  they relate to the argument that I want to make as to
11  Mr. McCrory's innocence.  And so, for that reason, that also
12  factored into why I was not able to complete the motion, Your
13  Honor.
14        THE COURT:  Have you discussed your possible
15  participation in this hearing with the prosecution?
16        MR. TANNER:  Yes, Your Honor.  We all anticipated
17  that, and that's why the government -- it wasn't at my urging.
18  Mr. LaMarca, he sent me the same e-mail on Friday that he sent
19  to Mr. Colette asking me to come over to meet.  So the
20  government did meet with me on Monday morning to go over these
21  documents.  And I know that the record reflects that
22  Mr. McCrory was provided notice via ECF that he was a part of
23  this hearing.  So we were prepared or we were briefed on what
24  the government had gotten.  And I understand that the
25  government only got it as of Friday, but I didn't get it to

1  where I could have a copy to review myself until yesterday.

2          THE COURT:  All right.  Thank you very much.  Let me

3  turn to the prosecution.  Mr. LaMarca, are you speaking?

4          MR. LAMARCA:  Yes, Your Honor.

5          THE COURT:  What about the involvement here of

6  Mr. McCrory and his counsel?

7          MR. LAMARCA:  With regard to their participation in

8  this hearing, Your Honor?

9          THE COURT:  That's correct.

10          MR. LAMARCA:  The government would have no objection

11  to Mr. McCrory and his counsel participating in this hearing.

12  The matters that will be presented as far as contracts, the

13  consulting fees that were paid to Mr. McCrory and/or his

14  company, Investigative Research, will be brought out in

15  testimony today.  For that reason and because those amounts, if

16  the court accepts those amounts, may impact Mr. McCrory as well

17  as his -- the court's loss calculation for him and his

18  guideline range, I see no objection or have no objection to

19  Mr. Tanner today and Mr. McCrory, that is, through Mr. Tanner

20  having the opportunity to question with regard to the figures

21  involved here.

22          And as far as the government is concerned, today's

23  hearing was as to the net value of these contracts so that the

24  court can take into consideration that when it applies the

25  guidelines to determine the guideline -- the recommended or the

1    suggested guideline sentence for Mr. Epps and later for

2    Mr. McCrory.

3         THE COURT:  And what are you contending to be the

4    gross amount -- gross amount of the contracts?

5         MR. LAMARCA:  Your Honor, we intend to put forward

6    today testimony that would prove today only roughly 500 -- in

7    excess of $550 million.

8         THE COURT:  550 as the gross amount?

9         MR. LAMARCA:  Yes, sir.

10        THE COURT:  You said today.  Didn't I hear a figure

11   earlier of $800 million?

12        MR. LAMARCA:  You did, Your Honor, and that will come

13   in through some testimony that we will request of the court to

14   convene at a later date.

15        THE COURT:  How many witnesses do you intend to call

16   today?

17        MR. LAMARCA:  10, Your Honor.

18        THE COURT:  10.  And how long do you think those

19   testimonies will take?

20        MR. LAMARCA:  From the government's perspective, 20

21   minutes each.

22        THE COURT:  Have you provided the defense with the

23   names of these witnesses?

24        MR. LAMARCA:  I have provided to the defendant the

25   documents, the names of those witnesses, some of which the

1   government learned this morning.  The entities that were

2   subpoenaed, the defense has been provided with those.  The

3   representative for those particular companies, I don't believe

4   they know who they are even as we speak now.

5           THE COURT:  What about the documents that would

6   purportedly undergird these particular amounts?  Have they been

7   provided those documents?

8           MR. LAMARCA:  They have been provided those.  The

9   government provided those to them as the government received

10  them or at least within 24 hours.  We did receive some on

11  Friday, did not show them to the defendant until Monday of this

12  week.

13          THE COURT:  And today being Thursday.  So what time

14  Monday were they shown these documents?

15          MR. LAMARCA:  Well, we were to meet at 9.  I think Mr.

16  Colette had a prior engagement, and he appeared at the U.S.

17  Attorney's Office roughly I would say 10:00 o'clock.  And, of

18  course, Your Honor, those were not all the documents that had

19  been produced; those were the documents that were produced up

20  to that point.

21          THE COURT:  So you are saying that more documents were

22  produced to you later?

23          MR. LAMARCA:  Yes, sir.

24          THE COURT:  And who was producing these documents?

25          MR. LAMARCA:  The entities that had been subpoenaed

1   for court today, those who had entered contracts with M.D.O.C.

2   and through their representative, their counsel, most of whom

3   have counsel in this courtroom today, provided those documents

4   either by overnight delivery or through secure e-mail, in that

5   fashion.

6           THE COURT:  And did you expect those documents at an

7   earlier date?

8           MR. LAMARCA:  I was hopeful I could have received them

9   at an earlier date.  My conversations with the various counsel

10  for these entities indicated that they were working diligently

11  on providing these documents.  They were hopeful, every single

12  one of them, to have those documents to the government and to

13  the defense in time or from the government to the defense in

14  time that everyone could agree hopefully on what those

15  documents say.  They were strictly accounting documents.  So

16  that they could avoid the necessity of having to appear in

17  court.  However, getting those documents at such a late time

18  and speaking with defense counsel, we got to the point that we

19  flew everyone in today.

20          The government, based upon the documents that we

21  received, is ready to put most of these -- those who are here

22  today on the witness stand to explain the documents.  These are

23  accounting procedures.  Bookkeepers are here, comptrollers from

24  these various companies that had contracted with M.D.O.C. and

25  some other subsidiaries or affiliates of M.D.O.C., contracts

1    nonetheless that were involved in this situation or in this

2    indictment.  And the government is ready to put these witnesses

3    on the stand to explain the documents that they have submitted

4    in an effort for the court to see what the total value of that

5    contract was and then what the net benefit.

6         THE COURT:  Where are these witnesses coming from?

7         MR. LAMARCA:  Some came from St. Louis.  Attorneys

8    came from Washington, D.C.  Some came from South Florida and

9    attorneys from South Florida.  We also have -- and we have some

10   local attorneys.  And I may have missed one or two from out of

11   state.  And Texas.

12        THE COURT:  So have you and your side had the

13   opportunity to sit down with these witnesses?

14        MR. LAMARCA:  We have talked to them briefly by

15   telephone.  And when I say briefly, 10 minutes, Your Honor.

16   And some I talked to this morning, as a matter of fact, out in

17   the hallway for about five minutes.  The documents they sent in

18   large part for most of these were very self-explanatory.  It

19   takes just a very rudimentary education in accounting to

20   discern.  Each of the entities and through their counsel were

21   directed to the *Landers* case as to what the court may be

22   looking for as far as net benefit, the *Landers* case having been

23   broached by the defense initially when the PSR came out basing

24   its guideline range on the gross value of the contracts.

25        The government conceded that *Landers* applied and so

1    directed each of the defense counsel to that particular

2    decision.  The subpoena that was issued to the corporate

3    entities requested certain documents to be produced.  And in

4    most instances, those documents have been produced, and those

5    were the documents that we were waiting on and to disclose to

6    defense counsel.

7         We have received those documents.  We believe that any

8    questioning of the methodology, how these numbers were arrived

9    at, can be done through the examination of the witnesses who

10   have appeared.  And based upon the documents that have been

11   supplied, the government would like to go forward to elicit

12   that testimony to explain what the figures are and how the

13   corporate entities arrived at the total value of the contract

14   to them as well as the net benefit using the *Landers* decision

15   as a guide.

16        THE COURT:  On a prior day the topic arose about the

17   revelation of unindicted coconspirators.  Will any of these

18   documents touch upon unindicted alleged coconspirators?

19        MR. LAMARCA:  Yes, Your Honor.

20        THE COURT:  And will any of the documents here reveal

21   names of alleged unindicted coconspirators previously not

22   revealed?

23        MR. LAMARCA:  The documents themselves may not; the

24   testimony may.

25        THE COURT:  The testimony of your witnesses might hit

1   on those particular points?

2          MR. LAMARCA:  That is correct.  And my request of the

3   court and of defense counsel would be whether defense counsel

4   first disputed whether the contract itself was tainted.  If

5   defense counsel does dispute whether it was tainted, then we

6   would elicit some testimony to show that particular contract

7   was tainted.

8          THE COURT:  I don't understand what you mean by

9   tainted.

10         MR. LAMARCA:  That it was actually involved.

11         THE COURT:  That it was actually what?

12         MR. LAMARCA:  Involved in the conspiracy scheme and

13  this bribery scheme, this kickback scheme that has been spread

14  over the pages of the indictment, Your Honor.

15         THE COURT:  And how would you propose to show that

16  relationship?

17         MR. LAMARCA:  Through testimony of an FBI agent who

18  has interviewed both Mr. Epps and Mr. McCrory, as well as

19  others, but primarily relying on the testimony of Mr. Epps and

20  Mr. McCrory.  I say testimony.  Conversations.

21         THE COURT:  In what order do you hope to call your

22  witnesses?

23         MR. LAMARCA:  I have an order, Your Honor, I would

24  call if there is absolutely -- if there is a dispute as to that

25  particular entity and whether those contracts were improperly

1   influenced, I would call the agent to testify as to the

2   influence on that particular contract and then intend to call

3   the representative of the company, a financial representative,

4   so that we can show to the court the gross value of that

5   contract and the net benefit.

6           When we move to the next company, if the defense

7   disagrees that those contracts are tainted, I would put the

8   agent on the stand so that the agent can testify as to what

9   Mr. McCrory and Mr. Epps said about that originally to the

10  agents and then put the representative of the company on the

11  stand to explain to the court what the gross value of that

12  contract and revenue was to the company and what the net

13  benefit was to the company.

14          And this is all in response to the *Landers* decision so

15  that the court can total up the net benefit of all of these

16  improperly influenced contracts to arrive at a guideline

17  calculation as required by the sentencing guidelines, Your

18  Honor.  As the court knows, if the guideline calculation as to

19  the net benefit which the court can reasonably ascertain not to

20  a mathematical certainty but to reasonably ascertain, once you

21  reach that net benefit and total all of these contracts, then

22  that would drive the guideline calculations if those net

23  benefits exceeded the bribe amounts of 1.4 million that had

24  been paid to Mr. Epps.

25          THE COURT:  This procedure you're describing, have you

1　discussed this with the defense?

2　　　　　MR. LAMARCA:  No, I have not, Your Honor.

3　　　　　THE COURT:  So this is the first time they have heard

4　this is how you wish to proceed?

5　　　　　MR. LAMARCA:  Yes, Your Honor.

6　　　　　THE COURT:  Is there anything else that you hope to

7　present today and in what manner that the defense is currently

8　unaware?

9　　　　　MR. LAMARCA:  There are a couple of corporate entities

10　who have asked that the documents that would be presented, that

11　the court would enter a protective order for proprietary

12　information being disclosed within those documents.  And I

13　would, on behalf of those entities, ask the court if the court

14　would entertain or consider hearing from those entities at a

15　sidebar to explain to the court why they wish that those

16　particular documents and testimony about those documents would

17　be under seal on a proprietary information reason and maybe

18　several other reasons that I'm not aware of.  Other than

19　that --

20　　　　　THE COURT:  So would that testimony or that

21　presentation be done outside the presence of the public?

22　　　　　MR. LAMARCA:  It would if the court were to seal and

23　find that information --

24　　　　　THE COURT:  Why should the court allow that?

25　　　　　MR. LAMARCA:  Your Honor, I would let the court hear

from the particular attorneys for that company to determine whether the court should or should not allow that to take place.

THE COURT: Okay. Thank you so much. Mr. Colette, you rose a few moments ago to make some comments. I will listen to you.

MR. COLETTE: Your Honor, we were here on April 11th of 2016 when the presentence report was prepared and revised presentence report was prepared. My notes reflect that you ordered the government to issue subpoenas to all these people. And they said they were going to do it that week, they would have it returnable in 30 days and that we would have two or three weeks to look at it. They did not issue a Rule 17(c) subpoena, Your Honor. Look at the subpoena they have issued. They are returnable for this morning.

THE COURT: Put it on the Elmo there.

MR. COLETTE: I am smart and I am quick, but I can't read $800 million worth of documents in a day and a half and I don't even have them. There is no way we can go forward. They dropped the ball.

THE COURT: What do you mean you don't have them?

MR. COLETTE: I don't have them. He just said -- he just told you. There is 15 companies listed in the presentence report that's prepared. Those 15 companies list $868,282,712.85 of contracts that were let by M.D.O.C. and

these various entities over the period of five or six years.
We all know that although Athena included that in the revised
presentence report that that gross contract amount, it's not a
loss, number one.  Make that clear.  It's not a loss.  The
State of Mississippi nor M.D.O.C., nobody lost any money.  That
number are just the value of the contracts to provide services
and commissary and telephones.

And the court says you don't use that amount.  The
court says under 2C1.1 you have got four things that you can
consider, Your Honor, in awarding the specific offense
characteristic.  One is the amount of the payment.  We know
that.  That's not disputed.  He got 1.4 million.  You can use
that.  And that's clear.

Then it says, or you have to use the net benefit in
return for the bribe.  That's what they are attempting to do.
So they have got to say, Okay, for example, on this contract,
it was a million dollars.  And they have got to show that there
was a bribery involved with that.  What was the net benefit?
The Fifth Circuit hasn't been really clear on how you determine
that benefit.  Now, they have talked about what not to possibly
include, and that's why we are talking about the *Landers* case
where it says you deduct -- the court in *Landers* used the gross
amount and the Fifth Circuit said that's wrong.  So they said,
No, you have got to deduct the direct cost.  And it said you
don't deduct indirect here because they didn't raise it and you

can't deduct indirect costs unless you can tie it to that
specific contract.  So it's an accounting gyration.  So that's
another method.  That's what we're looking at.

But we are nowhere close to that.  You asked me a
minute ago.  I got a call on Friday.  I'm looking for documents
30 days after April 11th, which I thought was when you said the
subpoenas were to be given.  That's what we talked about.
Athena has got nothing.  I have got nothing until Friday I got
a call, Hey, I got some documents but I haven't opened them up
yet.  Okay.  Good.  Thanks for calling.  Monday can you come
over here and look at these documents?  Well, I have got one
hearing and I will be right there.  And I did.

And we went over maybe four or five sets.  All right?
Example.  I don't get a copy Monday.  Carlos is there.  I
finally get a copy late Monday afternoon when we go over and
get it.  The very first one I get is Global Tel Link.  In the
presentence report, it lists Global Tel Link at $10 million.
It also should have CCI in there for 18 million.  So the
question is if we are not going to use the bribe amount, what
part of that 18 million was direct, indirect or whatever?

Okay.  You know all the documents supporting the
18 million?  I get a copy of a protective order, not one
document.  Not one.  Nothing.

Okay.  Let's go to the next one.  Thanks, Darren.  The
next one is Carter Global Link.  I get a one-page affidavit

1   from somebody or declaration I believe he calls it.  And again,

2   Carter Global Link is a $6.2 million company.  It's got some

3   numbers in there and it looks like it is about a million-dollar

4   net benefit.  But the problem the Fifth Circuit says is you

5   have got to ascertain and I have got to be able to challenge

6   the methodology in arriving at this net benefit because it is

7   not clear in the guidelines.

8           So without the supporting documents for this stuff,

9   I'm shooting blind.  And at 35 years of practice, I never have

10  been forced to cross-examine a witness who I have got nothing

11  to cross-examine on.  Now, do I know that there is a company

12  called CCI?  Yes.  Do you know how many documents I got on CCI?

13  I got zero.  Do I know there is a company called Admin Pros?

14  Yes.  Do you know how many documents I got on Admin Pros?

15  Zero.

16          THE COURT:  Now, slow down some.

17          MR. COLETTE:  I'm sorry.  Brenda is typing her fingers

18  off.

19          THE COURT:  I don't want Brenda to attack you later.

20          MR. COLETTE:  She's already getting close, Judge.

21  Thanks for saving me.  ATS, I got no documents.  $3 million.

22  College Street Leasing, I got no documents.  I mean I thought

23  the issue that we were here back in April was there was some

24  issue we didn't subpoena and we couldn't get them to comply and

25  you indicated you can resolve that problem, you can make them

come here.  All right.  But they can't come here on the morning
of the hearing and say, Well, we just got them and let Colette
cross-examine them.  Judge, there is no way we can proceed
today with that.

Mississippi Correction Management, I got no documents.
Sentinel GS, I got no documents.  On a couple of them, Wexford,
the big one, I have got a summary but I don't know how they
come up with it.  In other words, this specific offense
characteristic drives basically the possible sentence.  And
they want to just throw something up here with no support to --
and I have got to rely on some lawyer from Williams and Conley,
I think, that makes this determination of what they have
determined *Landers* says.  And I have not had any time to look
at it. I have not had any time to examine these documents.  And
I just don't think -- I don't think it's in compliance with
what you ordered having done on April 11th, and it is certainly
totally unfair to the defendant to attempt to cross-examine
witnesses about material either we just saw on the eve of this
hearing or that we haven't even gotten yet.  It just can't
proceed this basis.

Now, obviously there is people here.  There is a
couple, the protective order issues, maybe you can take that up
today, Judge.  But I cannot go forward as I stated in my motion
for continuance based on this -- and again, another thing, I
think it was 2:00 yesterday we got a disc with maybe 400 pages.

1  Here is some more documents to look at before 9:30.

2         THE COURT:  So how many pages of documents have you

3  received since Monday?

4         MR. COLETTE:  There is 400 more in addition to this,

5  and I'm going to guess this is about a thousand or 2,000 pages.

6         THE COURT:  Since Monday?

7         MR. COLETTE:  Here is the kicker, too, Judge.  I only

8  got stuff on seven or eight of the 15 corporations.  And again,

9  you touched on the other point, and that was what we discussed

10  in April also was what about some of these people who are under

11  investigation who we know are under investigation.  And now

12  they say, Well, you can cross-examine them but you can't ask

13  them about this or you can't ask them about that.  If you're

14  going to do this net benefit calculation, then the contract has

15  to be somehow in return for the bribe.  You just can't say that

16  Chris Epps and Cecil were good guys and they were buddies and

17  everything they did was wrong.  That's not the law.

18         And again, going back, it is not a loss amount.  It is

19  what was the net benefit of that contract and was there a

20  gratuity or a bribe tied to it?  So it's another layer that we

21  will have to pin down, but we don't even get there until I can

22  at least see what they are shooting at.  And I don't have a

23  summary.  There is a reason probation does these reports,

24  Judge.  You have been doing this longer than I have.  I mean

25  Athena has nothing.  I called her Friday:  Hey, Athena, have

1   you gotten anything?  I haven't got a thing.  I asked her this

2   morning:  Athena, did you get anything?  No.  We're just going

3   to wing it and you all figure it out.  I can't proceed on that

4   basis, and I think it's patently unfair to my client, and I

5   just think it's not a way to run a railroad.

6           THE COURT:  So then with regard to these witnesses,

7   were you provided their names?

8           MR. COLETTE:  No.  I have no idea.  I have got a

9   couple of documents that has this person and that person.  And

10  I talked to Darren about this Monday, Judge.  I said, Look,

11  without the supporting -- and Carlos was there, too.  Without

12  the supporting documents, I'm not sure that that witness is the

13  proper witness.  If they bring me the CEO of the company and he

14  puts in, I have got drug testing court, I have got one page

15  basically.  I got some bills back and forth, but I have got one

16  summary sheet.  It shows the total value of revenue which

17  basically exceeded the contract.  So they have got to explain

18  that.  It's got cost of goods sold, and then it has payments

19  for consulting fees and/or investigative research.

20          So it comes out on a $7 million contract, the net

21  benefit was 131,000.  I says, Darren, I accept that; let's move

22  on.  Well, wait a minute.  I think we've got to add back in the

23  200,000 that Cecil got because it was a bribe.  I said Cecil

24  didn't get bribed by DTC.

25          So the answer to your question, I don't know if these

are the right witnesses to put on.  If they are talking about
putting them on for a foundation to introduce the documents, go
at it.  But what I'm saying is I don't believe what they have
given us a gleaning picture of are the documents that we need,
nor do I think this person may or may not be the one who is the
proper witness for the purposes herein.

Again, I call the court's attention to this subpoena.
This is not really argument.  It should be my argument should
be theirs, but the subpoena called for the profit loss
statement, the gross value, the direct cost and various
payments.  All right.  That's what it called for.  And then I
got one-page summary.  I didn't see a profit loss statement
from that corporation.  I didn't see -- a couple of them they
did -- they did make me copies of contracts I already had.  So
that really. helped.  It had nothing to do -- I guess I'm
supposed to assimilate them and come up with some number.

But the issue is they have got the burden to prove net
benefit or to show this court what they believe to be net
benefit.  Then they have the burden to prove that that benefit
for whatever that contract is attributable to Mr. Epps or maybe
he don't get that one and maybe Cecil does, and maybe Cecil
doesn't and gets another one.

So I think there is a lot of work that needs to be
done by the government, Your Honor.  And as far as these
people, if -- I don't believe I'm making any objection as to

the foundation of the documents, but I have no supporting

documentation and I don't know how they were comprised.  And

the methodology according to the Fifth Circuit has to be proven

and shown.  And that's a de novo situation.

So unfortunately I think that had these subpoenas been

issued for May 9th and had they then had problems getting them,

we wouldn't be here where we are today.  But having subpoenas

issued for June 9th at 9:30 and then piecemealing me a handful

of documents, I just can't be ready to cross-examine any

witness until I have had a chance to read them.  Now, we have

gone through the little that we got, but again, it's the

supporting documentation that's lacking, and we have none of

that.  And I don't know what they are going to do with the four

or five people that are unindicted that I know I will ask about

because it goes to the heart of the issue.

In other words, this was a -- the only reason you got

this contract, Mr. Jones, was because you and the commissioner

had a bribery scheme going.  Right?  Because if he says no,

then I take the position and the law supports me that amount is

not included.  Well, how do you ask somebody who has a Fifth

Amendment right about that?  Now, they say, Well, we can call a

corporate representative or whatever.  But we are going to

definitely discuss how the relationship happened, but I think

that's further down.

Judge, I just think -- I think I'm entitled to have

all the documents and whatever summary and the names of the

witnesses so that I could then say I don't think that's the

proper witness or I need more additional information as to how

they -- what they attributed indirect or direct costs.

THE COURT:  All right.  Mr. Colette, let's see.  Stay

at the podium, please.  Let's see then if this course of action

might suffice.  What if the government is allowed to call

witnesses as foundation witnesses only?

MR. COLETTE:  To get the documents in.

THE COURT:  To get the documents in, if possible.

Then the defense can cross-examine as to whether that witness

is the proper witness who will serve as a foundation witness.

Would you need the documents in toto in order for you to

conduct such a cross-examination?

MR. COLETTE:  Yes, because I don't know what I would

be asking them.  If someone were to come here now --

THE COURT:  So then what you are saying is that even

as a matter concerning a predicate witness, at this point you

are not ready to go forward.

MR. COLETTE:  No.  And if it's just a predicate

witness, I'm not raising any issue as to admissibility of

whatever documents they provide.  So they don't have to come

back.  If all they are is a custodian witness and they are not

going to be able to tell me about how -- did you prepare this

summary, Mr. Witness?  And if he or she says no, I don't need

1    that person anyway.  I need the person who prepared the

2    document that they are putting in.

3          THE COURT:  So you don't object to the government's

4    attempt to call predicate witnesses at this point and go no

5    further than simply maintaining testimony relative to the

6    admissibility of the documents, whatever they might be?

7          MR. COLETTE:  The court's indulgence.

8      (SHORT PAUSE)

9          MR. COLETTE:  Judge, I just don't think I'm adequately

10   prepared at this point.  I don't know the names of the people.

11   I don't know what they are going to introduce.  All I can tell

12   you is I have only had a couple little submissions.  And these

13   people may be the right witness to examine about them.  And so

14   if I reserve my right to cross on the competency of the

15   document, they have got to come back anyways.  So I am not

16   prepared to do it from a foundation standpoint, and I don't

17   think they have got the proper documents.  That's the other

18   problem.

19         THE COURT:  All right.  Next question.

20         MR. COLETTE:  Yes, sir.

21         THE COURT:  You have some documents.

22         MR. COLETTE:  Yes, sir.

23         THE COURT:  And you received some documents prior to

24   Monday?

25         MR. COLETTE:  No.

THE COURT: You didn't?

MR. COLETTE: No, sir. The first hands-on documents, we saw some documents in Darren's office Monday. The first hands-on when Kevin went over there Tuesday. He said we got a call saying there are some documents up front, come get them. We ran down there immediately and got them. We brought them back. There were like seven or eight out of the 15.

THE COURT: Seven or eight companies.

MR. COLETTE: Right. And the first company had no documents, had a copy of a protective order. So now we are down to six. And the next one was just the one declaration sheet, some fellow. And the other ones -- the only one that comes close to being useful to some degree would be Drug Testing Corp. And that's a situation where they did a summary. I don't know about the supporting documentation. We did have some receipts, and they did show the cost of the cups. This was the testing company. That may have some semblance of usable information. That's the only one that I can see.

On Wexford, it was a 200 and some million dollar contract, and I'm not sure -- they have a summary chart is all. Not a supporting documentation one. I don't believe they have provided any of the contracts. Again, the actual contracts we should have. But on Wexford, I just had the -- $286 million contract and this is what I get. A copy of the subpoena. That's two pages. And a summary chart and a letter from the

attorney.  And from this chart I'm supposed to try to ascertain what it means.  And already two years that we pointed out Monday are excludable, '07 and '15.  My client wasn't there in 15.  So that's what I get.  I have no support for $280 million.

And yet the subpoena -- understand the subpoena that Wexford got says the profit and loss statement, the gross value of the contract, the direct costs and all payments or contracts or products worked with Cecil.  Now, they did attempt to comply with that, and he indicated that, By the way, the monthly consulting payment to Mr. McCrory is included in the other miscellaneous costs, other on the cost entry line.  And from this, I can just -- I'm just guessing the amount.

Now if they wanted to put whoever prepared this on, this summary, if they in fact prepared it and put these numbers in there, but I still need all of the supporting documents, Judge.  Take their word for it they did it properly?  I can't do that.

THE COURT:  So you are telling me then that with regard to these 15 companies that you are not prepared to go forward on any of them?

MR. COLETTE:  No, sir.

THE COURT:  Okay.  Thank you.  Now, let me hear from the other defendants.

MR. BAIN:  Your Honor, thank you.  And on behalf of Sam Waggoner, we're really here in kind of a peripheral limited

role, I guess.  But as to the documents, we haven't received anything, not the first document that would go as to his case. I understand I may not be privy to those with Mr. Epps and Mr. McCrory, but as to Waggoner, we haven't received the absolute first document.  All we got was a subpoena for CCI which was the company that Mr. Waggoner was an officer of asking for documents, asking for him to provide documents, in which I know the court may be aware, may not be, which we filed a motion for more time to respond to that.

THE COURT:  All right.  Thank you very much.  And Mr. Tanner?

MR. TANNER:  No, Your Honor.  I basically join in with Mr. Colette's argument.

THE COURT:  All right.  Thank you.  Government's response.  Essentially how can the defense be expected to go forward today on cross-examining witnesses and documents?

MR. LAMARCA:  Very simply.  The same way the government intends to go forward, Your Honor, by taking the production, as an example, what Mr. Colette mentioned with regard to Wexford, taking that production, having the witness take the stand, asking questions:  Did you go back through your records, determine what the gross value, the gross revenue for that contract was?  Yes.  What was it?  Did you prepare a spreadsheet?  Yes.  What amount?  They tell me the amount, we look at the year, and there it is.

```
1              THE COURT:  Now, how does the defense verify that?
2              MR. LAMARCA:  Your Honor, the defense can subpoena
3   every document that they want from any company they desire to
4   say whether an individual who in this instance, a pharmacy
5   bill -- in this case, let's look at 2009 pharmacy expenses of
6   $7 million right above the mark there.  $7 million.  The
7   defense, if they want to determine whether all of that
8   $7 million worth of expenses related to this particular
9   facility, they can make that happen.  They can go subpoena
10  every bill that amounts to $7 million to determine whether that
11  $7 million record is accurate.  These are business records, a
12  compilation of a business record.
13             THE COURT:  So then towards your production of
14  records, what records did you produce to them at the last
15  minute on Monday?
16             MR. LAMARCA:  I produced this document right here.
17  This is what I received in compliance with a subpoena that was
18  sent, Your Honor.
19             THE COURT:  So you are saying that you submitted to
20  them a summary of this information?
21             MR. LAMARCA:  I submitted to them the summary that I
22  received from the company that was subpoenaed, and this is what
23  was provided to me.
24             THE COURT:  So how can the defense cross-examine a
25  summary?
```

1           MR. LAMARCA:  The defense can ask the questions about

2      how this summary came to be?

3           THE COURT:  And how can they impeach?

4           MR. LAMARCA:  They can only impeach if they go get the

5      records that they believe may or may not be responsive to the

6      questions that were asked.

7           THE COURT:  In your estimation, was the government

8      required to provide that information?

9           MR. LAMARCA:  No, sir.

10          THE COURT:  Why not?

11          MR. LAMARCA:  The government is required to go forward

12     to arrive at net benefit.  We have subpoenaed these particular

13     entities requesting just that and the profit and loss or an

14     itemization.  As an example, this was an attachment to a

15     different subpoena, but it requested the same information.

16     This is what was requested of each company.  This, in

17     compliance with *Landers*, is what we requested.  Once we

18     received those this past week and last Friday, we turned them

19     over to the defense counsel, Your Honor.

20          THE COURT:  So these volumes of papers that have been

21     shown to me, those papers add up to more than just summaries.

22     Do they not?

23          MR. LAMARCA:  In some instances, they are all the

24     contracts.

25          THE COURT:  So now how then did you make a

1  determination of when you should submit the contracts and not

2  submit contracts?

3          MR. LAMARCA:  When I submit to the defense?

4          THE COURT:  Submit or not submit contracts.  You said

5  some of the information you submitted on Monday constituted

6  contracts?

7          MR. LAMARCA:  Well, contained the contracts.  I

8  submitted everything we received from the corporate entities in

9  compliance with the subpoena that was issued.  Some corporate

10 entities did not send me the contracts.

11         THE COURT:  And how then could the defense

12 cross-examine on that?

13         MR. LAMARCA:  On that particular person as to the

14 contract, they may not be able to, Your Honor, as to the actual

15 contract.

16         THE COURT:  And then with regard to the numbers that

17 have been supplied pursuant to these summaries, how does the

18 defense cross-examine that?

19         MR. LAMARCA:  Again, by asking them questions as to

20 how those summaries or that compilation was made.  Based upon

21 what records?  Records of the company.  In Wexford's case, the

22 witness will testify these were the records of the company.

23         THE COURT:  And where are those records?

24         MR. LAMARCA:  Those records are maintained within the

25 company as business records, Your Honor.

1    THE COURT:  So then the defense would not have those

2  today?

3    MR. LAMARCA:  No, sir, they would not.  If they wanted

4  those, they could subpoena those, Your Honor.

5    THE COURT:  Well then would they have known what they

6  needed if they hadn't had a chance to review all of this?

7    MR. LAMARCA:  They could have.  They certainly could

8  have with any foresight and said, *I want all the supporting*

9  *documentations.*  They were aware of what we were asking the

10  defense for, which is the *Landers* case.  They could issue

11  subpoenas to get all these records if they so desire.  Our

12  purposes here today -- our efforts today were strictly to

13  present to the court in a hearing for a guideline calculation

14  what those direct costs and what the net benefit of the

15  contracts were.

16    THE COURT:  All right.

17    MR. LAMARCA:  That's what we asked the companies to

18  supply us with.

19    THE COURT:  At the last hearing when I said that I

20  wanted this information provided to them timely so that they

21  could study it and be prepared to go forward, did I not

22  indicate that I would like for them to have two or three weeks

23  to do so?

24    MR. LAMARCA:  I don't remember the time, but I can

25  tell you that you did ask that they -- or you did say that you

1    would like them to have them sufficiently ahead of time.  I

2    acknowledge that, Your Honor.

3         THE COURT:  Would you consider providing information

4    to them Monday sufficiently ahead of time?

5         MR. LAMARCA:  I think sufficiently ahead of time for

6    them to examine the particular witnesses who are here today on

7    these documents, yes, Your Honor.  I think they can do the same

8    examination that I can do, and if they want additional

9    information, additional information, they can subpoena that

10   additional information for another hearing.

11        THE COURT:  And then do the hearing all over again.

12        MR. LAMARCA:  Well, it won't be all over, but it would

13   be as to the supporting documentation.

14        THE COURT:  Well, what if they want to ask pinpoint

15   questions about information they find within the documentation?

16   Then they might have to have a hearing later on to try and do

17   that.

18        MR. LAMARCA:  Yes, sir.  I agree.

19        THE COURT:  So then we would be wasting our time

20   today.

21        MR. LAMARCA:  I don't think we are wasting our time,

22   Your Honor, with these people who have flown here today to

23   testify as to how these figures came about.  They are the

24   comptrollers in some instances, in some instances the

25   bookkeepers who are here to testify that we went through our

1   records and these are the totals that pertain to advertising,

2   that pertains to transportation, in compliance with these

3   contracts that we have with M.D.O.C.  They can testify to that.

4          Now, if Mr. Colette does not believe and wants to do

5   an audit of the company, I don't think the case law requires an

6   audit to be done of each individual contract; it requires the

7   court to come to a reasonable estimation of the net benefit of

8   these contracts.  The government, having subpoenaed these

9   witnesses, having brought them here, is ready to go forward to

10  show the court what the net benefit of these contracts were to

11  these particular companies for the court to then arrive at its

12  decision in July -- I think it's July 19th as to the

13  appropriate guideline range.

14         In the meantime, if the defendant believes that these

15  numbers are hocus pocus or that they are just thought up out of

16  thin air, then the defense can subpoena what records they wish

17  to contest these figures that we intend to present today, Your

18  Honor.  I don't think it's a waste of time.

19         THE COURT:  Tell me how many pages of documents you

20  produced to the defense on Monday.

21         MR. LAMARCA:  On Monday, it would have to be an

22  estimate, Your Honor.  I would say with the contracts included,

23  4 or 500 pages.

24         THE COURT:  4 or 500?

25         MR. LAMARCA:  Yes, sir.

1          THE COURT:  I thought Mr. Colette gave a different

2    number.

3          MR. COLETTE:  On Monday, but then --

4          THE COURT REPORTER:  I'm sorry.  Can you get on the

5    microphone?

6          MR. LAMARCA:  Tuesday.

7          MR. COLETTE:  We didn't get the documents actually

8    picked up or told to pick them up until Tuesday.  And he is

9    saying it's 4 or 500.  I will accept that.  I think on

10   yesterday is when we got another 4 or 500 from just one other

11   entity that was delivered directly to our office.  Another 4 or

12   500.  So there is a thousand or so documents.  Mr. Epps and I

13   tried to go over them yesterday morning, at least the initial

14   submission.  And then again, like I said, that's what we have.

15   So that's all we've got that represents $800 million.

16         THE COURT:  Did you meet with the defense prior to

17   this morning?

18         MR. LAMARCA:  I met with them Monday.

19         THE COURT:  Monday?

20         MR. LAMARCA:  Yes, sir.

21         THE COURT:  Now, during that meeting did you inquire

22   as to whether they were prepared to go forward?

23         MR. LAMARCA:  Yes, sir.  Mr. Colette said he could not

24   go forward, that he was willing to file a motion to continue.

25   Willing.  Was going to do so.  The government at that time said

we wouldn't object to that.  I even spoke to Mr. Colette that evening or at least we corresponded Monday evening saying I wouldn't object to a two-week continuance to give you the time to do it.  And that's where it remained as of Monday evening. And then late yesterday afternoon or day before yesterday, I don't remember, I think it was the day before yesterday, Mr. Colette did file his motion.

I had mentioned to Mr. Colette that I needed an order of the court if we were going to have one, a continuance, before -- or at least an order as of Tuesday so on Wednesday the government would not go through the expense of flying people down to testify.  Of course, with it just being filed Tuesday afternoon, the order or any consideration of that motion it appeared to the government was not going to occur until this morning.  So out of an abundance of caution, we flew everyone down with the expectation that we would need them or with the caveat that we very well may need them, and if we do, we needed to have them here.  So we have them, the witnesses and corporate counsel, who are present, Your Honor.

THE COURT:  Who is your clearest witness?

MR. LAMARCA:  We have several.

THE COURT:  Name me one who if that person testified should be able to provide the clearest testimony.

MR. LAMARCA:  Your Honor, a representative from Keefe Centric Company doing business as Keefe.

1          THE COURT:  And what type of business is this?

2          MR. LAMARCA:  It's a commissary business.

3          THE COURT:  And how much is the contract price there,

4   the gross amount?

5          MR. COLETTE:  In the presentence report, Your Honor --

6          MR. LAMARCA:  I'm sorry, Your Honor.  I don't mind

7   answering your question if it was directed at me.

8          THE COURT:  All right.  Go ahead.

9          MR. LAMARCA:  Thank you.

10         THE COURT:  Go ahead.  You can answer the question.

11         MR. LAMARCA:  The testimony would be $54,461,955.

12         THE COURT:  All right.  54 million what?

13         MR. LAMARCA:  $54,461,955.  These are accurate figures

14  from Keefe, not the -- what was -- may or may not have been on

15  the face value of the contract, but this is the actual revenue

16  to be expressly and as explicit as possible so that the court

17  can have the most accurate information it can in determining

18  this guideline range.

19         THE COURT:  Now, has the documentary information been

20  submitted to the defense?

21         MR. LAMARCA:  Yes.

22         THE COURT:  What has been submitted?  One second, Mr.

23  Colette.  What has been submitted to the defense?

24         MR. LAMARCA:  We submitted this set of documents to

25  the defense, which includes --

1          THE COURT:  All right.  You are holding up a group of

2     papers, and that would total approximately how many?

3          MR. LAMARCA:  37 pages.  We had to supplement because

4     the Excel spreadsheets that were sent did not print because it

5     was in native format, and so we ended up sending those

6     separately by e-mail to the defense.

7          THE COURT:  All right.  And when did you send those to

8     the defense?

9          MR. LAMARCA:  I believe it was two days ago, the Excel

10    spreadsheets.

11         THE COURT:  Let me see those documents, please.  Pass

12    them over.

13         MR. COLETTE:  Judge, can I add --

14         THE COURT:  One second.  I will come to you.

15         MR. LAMARCA:  I'm looking for the Excel spreadsheets

16    to make sure that they are in this particular packet, Your

17    Honor.

18     (SHORT PAUSE)

19         MR. LAMARCA:  Your Honor, what I'm about to present to

20    the court is a particular set of documents that counsel for

21    Centric is requesting a protective order and would like to be

22    heard on that, but I don't believe there would be any concern,

23    of course, with the court seeing these particular documents.

24         THE COURT:  Well, now, I thought you were going to

25    call somebody from -- what organization did you name?

1          MR. LAMARCA:  Centric doing business as Keefe.

2          THE COURT:  But they are asking for a protective

3    order?

4          MR. LAMARCA:  They are.  The court would have to

5    address that issue before it's presented.

6          THE COURT:  Well, then let's take up some company

7    which is not seeking a protective order.  And show me then what

8    you have submitted to the defense and how many documents are

9    involved.

10         Now, counsel, you said that there are 34 documents or

11   34 pages in this set of documents you provided to the defense,

12   but in this notebook that you just took off or file that you

13   just took off the podium, it seems to contain far more than 34

14   pages.

15         MR. LAMARCA:  It did, Your Honor.

16         THE COURT:  So then are those additional documents?

17         MR. LAMARCA:  Not from the company.  Those are

18   documents of the defendants -- if the court is inquiring, I

19   will tell the court.  Memorandums of interviews with Mr. Epps,

20   with Mr. McCrory, so that we can be prepared for the court to

21   address any issue that the defense has that these contracts are

22   not pertinent to the indictment of Mr. Epps.  So we have that

23   in there, not for the defense but for questioning of the

24   witness, not this witness, but of the FBI agent as I mentioned

25   to the court earlier, the protocol that we had intended to

1   take.  So there were a number of documents in that folder as to

2   that, Your Honor.

3         In addition, in that folder were several copies, sets

4   of the documents that we had submitted.  So what you have seen

5   included three sets of the same documents that were sent as

6   well as reports that were given or taken by the FBI of

7   interviews with various entities, most particularly the

8   defendants themselves.

9         THE COURT:  All right.  So have you identified or

10  located a company whose representative is here and you are

11  prepared to tell me what have you submitted to the defense?

12        MR. LAMARCA:  Yes, Your Honor.

13        THE COURT:  Okay.  What do you have?

14        MR. LAMARCA:  One of the companies is GEO Group.

15        THE COURT:  GEO Group.  What kind of company is that?

16        MR. LAMARCA:  GEO maintained services -- management

17  services of various facilities -- prison facilities in the

18  State of Mississippi, Your Honor.

19        THE COURT:  And how much money are we talking about

20  there?  Gross amount.

21        MR. LAMARCA:  148,983,914.

22        THE COURT:  Okay.  Over what period of time?

23        MR. LAMARCA:  That would be from the date that the

24  consulting agreement was entered between GEO and Investigative

25  Research, a company owned by Mr. McCrory, and that would be

1  from 8-1 of 2008 through 2012.  And we anticipate that that

2  figure I gave the court would be the figure testified to by the

3  witness present.

4          THE COURT:  $148,983,914?

5          MR. LAMARCA:  Yes, Your Honor.

6          THE COURT:  And the representative who would be the

7  sponsor of those documents would be what person?

8          MR. LAMARCA:  John Tyrrell.

9          THE COURT:  And his position?

10          MR. LAMARCA:  Your Honor, I know he is in the

11  financial department.  I can't tell the court specifically

12  right now whether he is the comptroller or the chief operating

13  officer.

14          THE COURT:  And what quantum of documents do you

15  propose to give to the defense concerning this entity, GEO

16  Group?

17          MR. LAMARCA:  The same set of documents that we have

18  already disclosed to the defense.

19          THE COURT:  And how many pages is that?

20          MR. LAMARCA:  Your Honor, these documents were not

21  Bates stamped when received nor when delivered.  I would say it

22  comprises roughly three quarters of an inch thick.

23          THE COURT:  But you don't know how many pages?

24          MR. LAMARCA:  I don't know specifically the number of

25  pages, Your Honor.  I can count them if the court wishes.

1          THE COURT:  Just do a quick count.

2      (SHORT PAUSE)

3          MR. LAMARCA:  Roughly 236.

4          THE COURT:  And when were these 236 pages delivered to

5  the defense?

6          MR. LAMARCA:  We believe they were sent on Tuesday,

7  Your Honor.

8          THE COURT:  What time?

9          MR. LAMARCA:  It would have been 1:00, 2:00, Tuesday,

10  p.m.

11          THE COURT:  All right.  And let me see a copy of that

12  set.

13      (DOCUMENTS TENDERED TO COURT)

14          THE COURT:  Who is Investigative Research?

15          MR. LAMARCA:  It would be a company owned by

16  Mr. McCrory.

17          THE COURT:  Now, what involvement, if any, are you

18  contending that Mr. Epps has in this matter?

19          MR. LAMARCA:  Mr. Epps influenced the contract to be

20  sent to or to -- for M.D.O.C. to enter into the agreement with

21  GEO for these services.  And during that same period of time,

22  he recommended that Investigative Research be the consultant

23  for GEO in the State of Mississippi.  As a remuneration for

24  that consulting services, GEO paid Investigative Research and

25  Investigative Research then cut checks back to Mr. Epps out of

1    that consulting agreement.

2         THE COURT:  Are you contending that Mr. McCrory had

3    anything to do with this contract?

4         MR. LAMARCA:  I am contending that Mr. McCrory was a

5    direct beneficiary of that contract and that it was part of the

6    scheme that Mr. McCrory would receive consulting fees, in this

7    case, in the total amount of $344,000 and out of which money

8    was kickbacked to Mr. Epps as a result of the windfall, if you

9    might, that Mr. McCrory received as the consultant for GEO.

10   And so money was kicked back to Mr. Epps from Mr. McCrory.

11        THE COURT:  What about Mr. Waggoner?  Are you

12   contending that he is involved in this contract?

13        MR. LAMARCA:  No, Your Honor.

14        THE COURT:  So then these documents you have submitted

15   to me here pertain only to allegedly Mr. McCrory and Mr. Epps?

16        MR. LAMARCA:  Correct, Your Honor.

17        THE COURT:  What you have submitted to me are mostly

18   contracts and some checks that were written to -- some to Cecil

19   McCrory and others to the Investigative -- let me see what the

20   name of it was.  Investigative Research, Inc.  Is that correct?

21        MR. LAMARCA:  Yes, Your Honor.

22        THE COURT:  Were there any other checks included in

23   here that were written to any other entities other than to

24   those two?

25        MR. LAMARCA:  Not in response to the subpoena that was

1    issued to GEO.

2           THE COURT:  Was there a summary sheet of how much

3    money was produced as a result of these contracts?

4           MR. LAMARCA:  Yes, Your Honor.

5           THE COURT:  Where is it?

6           MR. LAMARCA:  About two-thirds of the way through.

7    You will see a spreadsheet.

8           THE COURT:  Okay.  I see the spreadsheet.  Now, this

9    spreadsheet, does it -- is it headed, *Marshall County,* at the

10   top?

11          MR. LAMARCA:  Yes, Your Honor.

12          THE COURT:  And then does it have the years 2007,

13   2008, '9, '10, '11 and '12?

14          MR. LAMARCA:  Yes, Your Honor.

15          THE COURT:  And then under there is East Mississippi?

16          MR. LAMARCA:  Yes.

17          THE COURT:  And then Walnut Grove?

18          MR. LAMARCA:  Yes, sir.

19          THE COURT:  Then on the last page it has total revenue

20   for these three entities, Marshall County, East Mississippi,

21   Walnut Grove, of $188,445,628?

22          MR. LAMARCA:  That's correct.  Yes, Your Honor.

23          THE COURT:  What was the figure you gave me earlier?

24          MR. LAMARCA:  I gave you a figure of 148 --

25          THE COURT:  983, 914.

1          MR. LAMARCA:  That's correct.

2          THE COURT:  Okay.  But this is the total revenue that

3  you are providing here.

4          MR. LAMARCA:  Right.  And the reason for the

5  difference between those two is what you see before you on the

6  spreadsheet includes figures from 2007 through 2012.  The

7  government -- which we requested.  The government's contention

8  and the government's evidence would be that Mr. McCrory's

9  contract as a consultant for GEO began August 1 of 2008.  So

10  the government did not include the 2007 annual figures, nor did

11  it include seven months of the figures for 2008.  So we took

12  5/12ths of 2008 and then added that to '9, '10, '11 and '12 to

13  come to the figure of 148,983,914.

14          MR. TANNER:  Your Honor, may I ask a question, please,

15  of the court?

16          THE COURT:  What's your question?

17          MR. TANNER:  Just in case the court is going to

18  require me or permit this to go forward today and require me to

19  cross-examine these folks, at every step of this process, the

20  government has alleged that this was a *but for* arrangement,

21  that *but for* the hiring of Mr. McCrory and the payment of

22  kickbacks.  I think they just addressed this matter that these

23  contracts started over a year before Mr. McCrory was ever

24  brought into the picture.  Am I going to get an opportunity to

25  ask them how could there be a *but for* if the contract preceded

1    or predated Mr. McCrory joining the group?

2          THE COURT:  We will see what we get to as we go

3    through these matters today.  Now, what I'm going to do here is

4    allow the defense to make their record as to why they can't go

5    forward through the examination of this John Tyrrell.  So then

6    call John Tyrrell.  And I might have some questions for John

7    Tyrrell myself.  So call that person and let me see what he has

8    to offer on this matter.

9          MR. LAMARCA:  All right.  We do call John Tyrrell.

10          THE COURT:  All right.  Where is he?  Is the rule

11   being invoked?

12          MR. TANNER:  Yes, Your Honor.

13          THE COURT:  Then all persons expected to be witnesses

14   today are directed to wait outside the courtroom until called

15   as witnesses.  Counsel are directed to assist the court in

16   maintaining a courtroom free of anticipated witnesses.

17      (SHORT PAUSE)

18          THE COURT:  Swear the witness.

19                         **JOHN TYRRELL**,

20   having first been duly sworn, testified as follows:

21                     **DIRECT EXAMINATION**

22   BY MR. LAMARCA:

23   Q   Mr. Tyrrell, if you would, introduce yourself to the court.

24   Tell the court what your position is with GEO, please.

25   A   Good morning.  My name is John Tyrrell.  I'm the director

1    of finance at our corporate office in Boca Raton, Florida.

2             THE COURT:  I need you to pull that microphone closer

3    to you, please.  All right.  Repeat your answers.

4    A    My name is John Tyrrell, and I'm the director of finance at

5    our corporate office in Boca Raton.

6    BY MR. LAMARCA:

7    Q    And you are director of finance for GEO.  Is that correct?

8    GEO Group?

9    A    Yes.

10   Q    And GEO Group is in what kind of business?

11   A    Basically we are an owner and operator of correctional

12   facilities.  We offer additional services through electronic

13   monitoring and data reporting, reentry centers and basically

14   it's in the criminal justice area.

15   Q    All right.  And in your position as director of finance,

16   you are responsible for what?

17   A    My primary responsibilities are financial planning and

18   analysis relating to our budgeting and forecasting processes

19   and also our treasury and cash management.

20   Q    I'm sorry.  The last part again?

21   A    Treasure and cash management.

22   Q    All right.  And were you asked to respond to a subpoena

23   that had been issued by the government in this case?

24   A    Yes, I was.

25   Q    All right.  And did you submit through your attorney a set

1    of documents in response to that?

2    A    Yes.  The majority of the documents by volume was prepared

3    through our accounts payable department by pulling invoices and

4    checks.  The financial summaries were prepared by myself.

5    Q    All right.

6              THE COURT:  Counsel, GEO Group, is GEO Group in any

7    way a target here?

8              MR. LAMARCA:  They are not.

9              THE COURT:  Counsel -- the witness mentioned having a

10   lawyer.

11             MR. LAMARCA:  That's correct.

12             THE COURT:  All right.  Is that counsel present with

13   you?

14             THE WITNESS:  No, he is not.

15             THE COURT:  So then back to the prosecution.  GEO

16   Group is not a target in any way?

17             MR. LAMARCA:  They are not.

18             THE COURT:  Okay.  Then go ahead and proceed.

19             MR. TANNER:  Your Honor, some of my questions may

20   implicate criminal activity on the part of GEO.  He needs to be

21   either warned that those may be coming -- and I think they

22   relate to the financial aspects of this testimony, because the

23   whole premise here again is that but for bribes and kickbacks,

24   GEO wouldn't have gotten these contracts.  So I'm entitled

25   to -- part of the problem I have noticed is that sometimes

1    we're assuming the predicate here.  We're assuming the *but for*,

2    so we are only talking about numbers.  But to the extent that

3    what we are trying to determine is the net benefit derived from

4    a bribe, then I'm entitled I think or I ask the court that I'm

5    entitled to ask him, you know, what did and did not derive from

6    bribes, the extent of GEO's knowledge concerning how these

7    numbers got on these pieces of paper and in his accounting

8    documents.  So to the extent that this man may not be able to

9    answer questions related to that and to the extent that if he

10   is, then my questions may implicate him or his company rather

11   in criminal activity, I think he needs to be apprized of that.

12        THE COURT:  Have you discussed this matter with the

13   prosecution?

14        MR. TANNER:  No, Your Honor, only because I have never

15   heard of this man until he just said his name.

16        THE COURT:  And what about this company?

17        MR. TANNER:  Concerning GEO?

18        THE COURT:  That's correct.

19        MR. TANNER:  No, Your Honor.  When you say what

20   matter?

21        THE COURT:  I'm saying have you discussed with the

22   prosecution your potential theory that GEO Group is criminally

23   involved in this matter?

24        MR. TANNER:  Well, no, Your Honor, except I would say

25   that has been the government's position that there is a *but*

*for.*  I guess if you break down what the government's theory

is, that GEO Group paid Cecil McCrory -- it would have to be

work he didn't do.  Right?  Because they paid him a sum in

order to get a contract.  I find it difficult to believe that

they could pay him -- I would imagine this man is not going to

say that GEO paid Mr. McCrory for work that he didn't do.

Right?  So what I'm saying is GEO -- the only way the

government's theory holds water is if GEO knew that there was a

bribe here.  Otherwise, there is no *but for*, and this whole

notion of these big contract values has nothing to do with

anything that this court could derive for a net benefit

analysis because the underlying premise is false.

     THE COURT:  All right.  Thank you.  Let me go back to

the prosecution.

     MR. LAMARCA:  Yes, Your Honor.

     THE COURT:  So then are you familiar with the

defense's theory on this?

     MR. LAMARCA:  I am, Your Honor.

     THE COURT:  And being aware of defense's theory at

this juncture, do you anticipate filing any charges against GEO

Group?

     MR. LAMARCA:  We do not at this time, Your Honor.  We

have nothing at this point that would be actionable.

     THE COURT:  Well, then at this point do you feel that

GEO ought to be given its Miranda warnings?

1    MR. LAMARCA:  If GEO -- if this witness -- I could say

2  it this way, Your Honor.  I think out of an abundance of

3  caution, every witness that takes the stand in any case would

4  be given the Miranda warnings if they were to possibly say

5  something that could incriminate themselves.

6    THE COURT:  But the court doesn't ordinarily do that

7  with each and every witness who testifies.  The court does that

8  when it comes to the court's attention that a witness may be a

9  potential target.

10    Now, according to Mr. Tanner, he is saying that GEO

11  Group might or should be in his estimation -- well, he is not

12  saying should be yet, but he wants to explore the possibility

13  whether GEO Group should be a target.

14    MR. LAMARCA:  Under -- with this defendant -- I'm

15  sorry.  With this witness who is testifying, Your Honor, this

16  witness is testifying on behalf of the company in the

17  production of the financial figures on behalf of the company.

18  The company, as the court is well aware, is not and does not

19  have a Fifth Amendment right against self incrimination.

20    THE COURT:  But individuals do associated with the

21  company.  And are you calling this witness here as a

22  spokesperson for the company?

23    MR. LAMARCA:  I am calling him as a spokesperson for

24  the company with regard to the production made in reply to our

25  subpoena.

```
 1              THE COURT:  Well, then let's see if you can limit your
 2     questions to that, then, because I said I would allow the
 3     defense to make a record with regard to the documents.  So at
 4     this point then you can ask about the production of the
 5     documents and the other side may question whether there are
 6     other such documents available and what would be needed to
 7     interpret these documents and what would be needed in order to
 8     challenge these documents if necessary.
 9              MR. LAMARCA:  Yes, Your Honor.
10              THE COURT:  And so let's just limit the testimony to
11     that.
12              MR. LAMARCA:  Certainly I intended to do so.
13              THE COURT:  All right.  Go ahead.
14              MR. LAMARCA:  Thank you.  May I approach the witness,
15     Your Honor?
16              THE COURT:  You may.  Show the other side what you are
17     giving him.
18         (SHORT PAUSE)
19              THE COURT:  Mr. LaMarca, you provided this to me.  It
20     has a government exhibit sticker on it.  Do you prefer to have
21     this one back?
22              MR. LAMARCA:  I do.
23              THE COURT:  Okay.  Why don't you substitute them.
24         (SHORT PAUSE)
25     BY MR. LAMARCA:
```

1    Q    (Tenders document.)

2    A    Thank you.

3         THE COURT:  Did you put a number on there?

4         MR. LAMARCA:  I did, Your Honor.  It's Government's

5    Exhibit 1.

6         THE COURT:  All right.  Government's Exhibit 1 is

7    marked only for identification at this point.  All right.

8    Proceed.

9    BY MR. LAMARCA:

10   Q    All right.  Back to my questions, Mr. Tyrrell.  As director

11   of finance, you were tasked as you have mentioned with the

12   responsibility of pulling together numbers pursuant or unique

13   to the contracts entered with the Mississippi Department of

14   Corrections as it pertains to the management of the facilities

15   at East Mississippi Correctional Facility, Walnut Grove

16   Correctional Facility and Marshall County.  Is that correct?

17   A    Yes.

18   Q    All right.  If you would, in the documents that you have

19   before you, in your efforts, you compiled, did you not, a

20   spreadsheet of the total revenue generated unique to each of

21   those three entities.  Is that right?

22   A    Yes.

23   Q    And that would be Marshall County, East Mississippi and

24   Walnut Grove?

25   A    Yes.

Q    And that appears within the set of documents of G-1 that you have before you.  Correct?

A    Yes.

Q    And the remainder of those documents within G-1 were produced in compliance with a subpoena, but you had no involvement in that.  Is that right?

A    No direct involvement in pulling them, submitting those documents.

Q    In those particular documents?

A    Yes, the checks, the invoices and the consulting agreement copies.

Q    Your responsibility was the spreadsheet.  Is that right?

A    Yes.

Q    Okay.  And in compiling the spreadsheet that we have before us, how did you go about doing that?

A    As a company, we do -- basically we track our facility performance on an individual basis so every facility has a profit and loss statement by month.  So using our financial system, I was able to run detailed P&Ls for all three of these facilities for the years that were covered under the subpoena, and then those were summarized into this document here.

Q    All right.  And where did you -- where did you go to get these numbers?

A    I mean the system is called Hyperion.  That's what we use for our financial reporting.  It's an Oracle product.  It's one

1  of our IT systems.

2  Q   And within that IT system, entries are made with regard to

3  expenses and attributed to a particular facility or a

4  particular contract?

5  A   Yes.  That's where all of our financial records get

6  consolidated, our revenue, payroll, accounts payable.  All of

7  our financial records get consolidated into that one system to

8  produce our financial statements.  In addition to the

9  individual facility P&Ls, we also do a consolidated public

10 financials out of the same system.

11 Q   So you can execute a query to gather what information you

12 desire out of that system.  Is that fair?

13 A   Yes, that's fair.

14 Q   All right.  And did you do that with regard to Marshall

15 County and East Mississippi and Walnut Grove?

16 A   I don't know if I would call it a query.  We have basically

17 a formatted report, so I just run a facility P&L and the report

18 comes out.  I define the year and period that I want to run,

19 and it produces the report by extracting the data from the

20 database.

21 Q   And that report that's produced is based upon entries made

22 into the system and coded in particular ways for certain

23 expenses and/or revenue.  Is that right?

24 A   Yes.

25 Q   Okay.  And the company relies on that information.  Does it

1  not?

2  A    Yes.

3  Q    And that's ordinary course of business of the company.  Is

4  that true?

5  A    Yes.

6  Q    All right.  And you, as director of finance, on behalf of

7  the company to determine profitability, whether things are

8  going well or not, review these documents periodically?

9  A    Yes.

10 Q    Or the information contained within your system?

11 A    Yes.

12 Q    And you took that information and you came to the

13 conclusions from, say, Marshall County, the top of that

14 particular spreadsheet page that we are talking about

15 showing --

16       MR. TANNER:  Objection if he is about to ask about the

17 specific numbers.  We are not there yet, Your Honor, I don't

18 believe.

19       THE COURT:  I'm going to let him go ahead and provide

20 the number.

21 BY MR. LAMARCA:

22 Q    Showing revenue for each particular year attributable to

23 that facility.  Is that right?

24 A    Yes.

25 Q    And you took that because of the revenue or as shown to you

1  based upon the business records of the company.  Is that right?

2  A   Yes.

3          MR. COLETTE:  Your Honor, I'm going to raise the

4  objection that he is testifying about a summary, and I think

5  Rule 1001 he has got to have the documents present for us to

6  verify that these numbers are accurate, and we don't have

7  those.  I object on that basis for the record.

8          THE COURT:  The record reflects your 1001 objection.

9  Now, we will come back to it later.  Now, go ahead, Mr.

10  LaMarca.

11         MR. LAMARCA:  Thank you.

12 BY MR. LAMARCA:

13 Q   With regard to specifically you were requested to produce

14 from 2007 to 2012.  Correct?

15 A   Yes.

16 Q   Without regard to why.  Correct?  Why you should or should

17 not?

18 A   Yes.

19 Q   In other words, you were trying to comply with the

20 financial aspect of the subpoena that was issued to your

21 company.  Right?

22 A   Yes.

23 Q   Okay.  And in 2008, you show a revenue of 11,375,687 for

24 Marshall County.  Correct?

25 A   Yes.

1  Q    And tell the court how you came to that particular revenue

2  figure for that facility.

3  A    The Marshall County facility was a per diem based revenue

4  which means we get paid a certain amount per inmate per day

5  that they reside in the facility.  So each month a billing is

6  prepared to the client that takes the daily population,

7  multiplies that by the per diem to derive a daily revenue which

8  is compiled into the monthly billing.

9  Q    And that's the total for 2008.  Is that correct?

10 A    Yes.  That's a total for the 12 months.

11 Q    For that particular --

12 A    For 2008.

13 Q    For that particular facility?

14 A    Yes.

15 Q    And you did a similar analysis for 2009, '10, '11 and '12

16 for Marshall County as represented by the numbers on your

17 spreadsheet in G-1.  Is that right?

18 A    Yes.  Our processes related to revenue have been unchanged

19 during this period of time, so they are all compiled the same

20 way.

21 Q    Okay.  Now, with regard to the costs and expenses

22 thereunder, do you see the itemization that you have?  Let's

23 look at 2008 particularly.

24       MR. COLETTE:  Your Honor, can we have a continuing

25 objection to all of this?  And I want to correct myself.  It's

1    1006 is my argument on the rules of evidence.  1001 just got me

2    in the ballpark, but 1006 says they have got to make the

3    originals available for examination prior to this.  Thank you.

4            THE COURT:  All right.  We will continue.  Go ahead.

5    BY MR. LAMARCA:

6    Q    So with regard to labor and related costs, tell us what

7    comprises that figure of 6,760,236.

8    A    That consists of virtually all employee-related expenses,

9    including just gross wages, overtime, benefit-related costs for

10   medical, dental, any other employee benefits paid by the

11   company.  It also includes payroll taxes, FICA, Medicare, state

12   unemployment insurance.  Basically it's all of the

13   personnel-related expenses.

14   Q    Okay.  And how did you compile those expenses to get to

15   6,760,000?

16   A    It's the sum of the categories of expenses from the

17   detailed report.

18   Q    And that sum was from the detailed report being the report

19   of all the expenses in the category of labor-related costs.  Is

20   that right?

21   A    Yes.

22   Q    In your computer system?

23   A    Yes.

24   Q    Which is maintained in the ordinary course of business in

25   your system.  Right?

1    A    Yes.

2    Q    And with regard to utilities, can you explain the $960,000

3    figure?

4    A    It consists of basically all of the roll-up of the utility

5    costs which would include electric, gas, water, sewer,

6    communications cost, telephone, internet connections.

7    Basically all of the routine utility costs that are incurred

8    for operating a facility.

9    Q    At the Marshall County facility.  That's unique to the

10   Marshall County facility.  Is that right?

11   A    Yes.

12   Q    I should say isolated to that facility.

13   A    Yes.  The direct costs associated with that particular

14   location.

15   Q    All right.  And repair and maintenance, the $231,000 figure

16   for that year, 2008?

17   A    Similar it's going to be use of outside contractors for

18   repairs at the facility along with purchases of equipment and

19   supplies to do in-house repairs from the maintenance staff.

20   Q    Now, let's talk about depreciation and amortization.  You

21   have deducted that from the total revenue.  Explain what

22   comprises the depreciation and amortization expense of 216,000.

23   A    The depreciation expense for any of these locations would

24   be associated with assets that GEO had paid for and put into

25   service at the facility.

1  Q    Such as?

2  A    So it could be kitchen equipment.  It could be security

3  equipment, radios.  It could be -- I mean you have got lawn

4  equipment, vehicles.  It could be --

5  Q    But directly attributable to the Marshall County facility?

6  A    Yes.

7  Q    Okay.  And then you have other operating expenses of

8  434,000.  Where does that come from?

9  A    It consists of -- I mean these facilities being managed

10 only didn't have significant property taxes, but if we had any

11 property taxes, it's going to cover property, vehicle and

12 property insurance, administrative costs like office supplies,

13 IT supplies, kind of things that don't roll up into those other

14 major categories.

15 Q    And in that instance, all of that that's attributable to

16 Marshall County, any other expenses are located right there

17 within other expenses.  Is that right?

18 A    Yes, sir.

19 Q    And then you have a total of operating expenses for that

20 one year of 10,449,535.  Right?

21 A    Yes, that's right.

22 Q    Now, you have another figure below that of overhead.

23 Explain what you mean by overhead and that for that figure of

24 750,000.

25 A    Well, in looking at an overall facility performance to

1    determine its profitability, we typically will apply an amount

2    of overhead associated with each location.  In this case we

3    calculated the overhead based on that contract's revenue

4    relative to the company's total revenue, came up with a

5    percentage and allocated overhead based on that percentage.  So

6    that, I would not view as a direct cost.  That's more of an

7    indirect, which is why I separated it from the roll-up above,

8    because the subpoena requested -- had a specific request

9    related to direct costs.  So that 10,000,449 is kind of the

10   subtotal of direct costs associated with that particular

11   operation.

12   Q   So with this particular operation of Marshall County in

13   2008, are there any other expenses for 2008 attributable to

14   execution of that contract directly in Marshall County other

15   than the 10,449,535?

16   A   Not that I'm aware of.

17   Q   And you've -- when you say *not that you are aware of,* you

18   went through your accounting system and pulled all expenses

19   relating to Marshall County for 2008 that had been coded into

20   the system in that fashion?

21   A   Yes.

22   Q   So if there was another expense that should have been

23   included in Marshall County's expense, that may have been coded

24   in some place for a facility in some other location like New

25   York, for instance.  That's possible.  Is it not?

1  A   It's possible but most definitely improbable.

2  Q   But it is possible?

3  A   Right.

4  Q   Okay.

5  A   I mean we don't audit every line item at every facility to

6  make sure that it's --

7  Q   Right.  These are the figures you actually rely upon in

8  determining profitability of the management of a particular

9  facility.  Right?

10  A   Yes.

11  Q   And then the overhead is just a percentage spread out over

12  across all the facilities the company manages as a -- based

13  upon the percentage of revenue?

14  A   Yes.

15  Q   Okay.  Gross revenue?

16  A   Gross revenue, yes.

17  Q   All right.  So in this instance for 2008, the net to the

18  company after excluding or deducting the direct costs would

19  actually be the total of the $750,441 and the 175,711.  Is that

20  right?

21  A   Yes.  The 925,000 is the approximate profit for that

22  facility before applying overhead.

23  Q   Before applying overhead?

24  A   Yes.

25  Q   And then the same manner without going through the specific

1  numbers, is that how you arrived at the figures for 2009 as

2  well?

3  A    Yes.

4  Q    And for each year thereafter from Marshall County as well

5  as for East Mississippi and for Walnut Grove?

6  A    Yes.  For each facility, every period reported.

7  Q    Okay.  And you had no numbers in Walnut Grove for '07, '08

8  and '09.  Is that right?

9  A    We didn't have those financial statements because Walnut

10 Grove was a contract under Cornell Companies which we acquired

11 in 2010, so we don't have the detailed historical financials to

12 provide.

13 Q    Okay.  But, in essence, not having that, it doesn't show

14 any gross revenue that may be affected or in this case.

15 Correct?

16 A    Yes.  The contract was awarded before 2010, and Cornell

17 Companies operated it prior to that.  But I do not know the

18 start date or what the annual value of that was prior to us

19 acquiring the company.

20 Q    All right.  Now, look behind that.  Do you see more

21 documents with regard to canceled checks?

22 A    Yes.

23 Q    As well as invoices?

24 A    Yes.

25 Q    Did you have any involvement with the production of that?

A    I did not pull them, but I am familiar with our processes in accounts payable.  And, I mean, I recognize them all because I have seen similar documents before in other situations when we have had to pull invoices and check copies.

Q    And the company did produce these in response to the subpoena when the subpoena requested all payments for Cecil McCrory and/or Investigative Research.  Is that right?

A    Yes.  They were pulled in response to letter D from the subpoena.  Any and all payments, contracts and work products of Cecil McCrory and/or Investigative Research.

Q    All right.

        MR. LAMARCA:  May I have the court's indulgence a moment, please?

        THE COURT:  Okay.

    (SHORT PAUSE)

        MR. LAMARCA:  Your Honor, I would ask that G-1 be admitted for this hearing and for the purposes of this hearing only.

        THE COURT:  I will defer ruling on it until after I have heard cross-examination.

        MR. LAMARCA:  Those are all the questions.

        THE COURT:  All right.  We will start with you, Mr. Colette.

        MR. COLETTE:  I renew my previous statement that I am unprepared to take this, but I understand your ruling.

THE COURT:  Well, I haven't said that we are going all the way through.  I just said that I am going to let you make a record by this truncated testimony just on foundation and predicate.  So go right ahead.

MR. COLETTE:  All right.

**CROSS-EXAMINATION**

BY MR. COLETTE:

Q   Mr. Tyrrell, let me ask you one thing before we get started.  Taking Marshall County, have you got that exhibit in there that the government was asking you about recently?

A   Yes.

Q   The summary you did?  Okay.  When you talk about 2008, $11,375 -- $11,375,687, you came up with that number off of some program you have got at your company.  Right?

A   Yes.  I have a financial reporting system.

Q   All right.  Where does it reflect the charge-backs?

A   That revenue would be -- I'm not familiar enough with this particular contract, but if there were billing deductions or adjustments related to paying for contract monitors or for staffing penalties, those are going to be reflected in this number.  This is the net number paid to us by the State of Mississippi.

Q   All right.  Because that happens.  You get charged back. If you don't have the correct number of people working, M.D.O.C. would charge you back on your contract.  Right?

1    A    I'm not familiar with this contract, but that's not an
2    uncommon term in a contract.
3    Q    But my problem is that 11,375, we just have to assume that
4    has charge-backs or whatever.  That's a number you just pulled
5    off your program.  Right?
6    A    It's a number out of our system supported by our accounts
7    receivable subledger that contains all of the monthly billings.
8    Q    But you don't know for sure if that reflects charge-backs
9    or not?
10   A    If there are charge-backs, it should reflect them.  Or if
11   there were.
12   Q    Now, explain to me this, and maybe I just wasn't listening,
13   but staying with 2008, you had an $11 million contract,
14   10 million in operating expense and you assigned a percentage
15   of revenue for overhead.  Right?
16   A    Well, we assigned a percent of overhead based on revenue,
17   yes.
18   Q    But that figure, $750,000, you basically have ascertained
19   that and you assigned it to this specific contract, being the
20   Marshall County contract.  Right?
21   A    That amount was for this particular contract.
22   Q    You are able to do that.  Right?
23   A    I can pull the revenue number for any contract.  I can give
24   you any --
25   Q    But what I'm saying is the way your program, your financial

1    system is set up, your company allocates a certain percentage

2    of revenue for overhead for that specific project, that

3    contract?

4    A    The application of overhead is not an automated part of our

5    system.  It is a calculation that we did.

6    Q    Let me ask you this.  I'm looking at the document, and I

7    have got overhead 750,441.  That has nothing to do with the

8    facility in Timbuktu.  Does it?

9    A    It's not a direct cost of operating that facility.

10   Q    We're going to get to direct and indirect and how you

11   understand that.  My question to you is on your sheet summary

12   that you prepared for us, the $750,441, that's assigned only

13   overhead as to Marshall County.  Correct?

14   A    That amount is Marshall County's allocation of total

15   overhead.

16   Q    No other contract?

17   A    No.

18   Q    Thank you.  Did you tell us that you read *Lander* case

19   before you complied with this subpoena or was that your lawyers

20   did that?

21   A    That must have been our counsel.

22   Q    Because there is a different definition in accounting terms

23   for direct costs and variable costs.  Is that correct?

24   A    Yes.

25   Q    So in this particular case, then, if the law says that you

1  can deduct overhead that's assigned to a specific contract,

2  then the profit for 2008 would be 175,000.  Right?

3  A   When you net the overhead into it, it would be 175.

4  Without the overhead, it would be --

5  Q   And what does that word *fee* mean?  It says fee.  That

6  wasn't some fee to somebody?

7  A   That's basically the remaining profit after applying

8  overhead.

9  Q   All right.  So the net would be 175,000 out of 11 million.

10  And you show this for '09, and then it looks like in '10 you

11  lost $6,700 on a $10 million contract.  Right?

12  A   Yes.

13  Q   Now, you made up for it in '11.  You made $500,000.  Right?

14  A   Yes.

15  Q   But you lost it in '12.  95,000.  Right?

16  A   In 2012 all three contracts were transitioned to another

17  operator.

18  Q   All three contracts -- you were fired by Commissioner Epps

19  in 2012?

20  A   I haven't seen those documents.

21  Q   You don't have any bills for after 2012.  The third quarter

22  of '12 after Commissioner Epps fired your company, you don't

23  have any bills for that.  Do you?

24  A   There are no direct facility costs associated after that

25  period that I'm aware of.

1          MR. COLETTE:  May I approach the witness?

2          THE COURT:  You may.

3   BY MR. COLETTE:

4   Q   I'm not saying you pulled it, but have you looked in that

5   packet?

6   A   Yes.

7   Q   Who decided to give Cecil a raise from 5,000 a month to

8   10,000 a month?  You?

9   A   No, it was not me.

10  Q   Somebody in your company, though.  Right?

11  A   Yes.

12  Q   Who was that person?

13  A   The person who signed it is Wayne Calabrese who is our

14  former president and chief operating officer.

15  Q   So your former president and chief operating officer

16  decided because of Cecil, whatever it says, their need for

17  increased consulting services, they increased his fee to 10,000

18  a month effective October 1st, 2010.  Is that correct?

19  A   That's what the letter says.

20          MR. COLETTE:  I would like to have this marked as an

21  exhibit.  It is contained in the court's exhibit for

22  identification.  But I have this as D-1 for identification.

23          THE COURT:  D-1 for identification.

24  BY MR. COLETTE:

25  Q   And you have got -- and you have in that stack a series of

1    checks that look like to be 5,000, 5,000 to either Cecil and/or

2    to Investigative Research that goes up to 10,000.  Is that

3    correct?  They look like about monthly.

4    A    It was a monthly invoice that he submitted for payment.

5    Q    Did you see any checks in there to Christopher Epps?

6    A    No.

7    Q    Are you aware of any payments that your company made to

8    Christopher Epps?

9    A    I am not.

10   Q    Do you know what Mr. McCrory did with whatever consulting

11   fees his company received?

12   A    I do not.

13   Q    How long did it take you to comply this summary,

14   Mr. Tyrrell?

15   A    It took, I mean, the better part of an afternoon.

16   Q    You just pulled it off the computer?

17   A    The reports come directly out of our system and then I

18   summarized them to that.

19   Q    And you do have all the backing, the supporting

20   documentation, at your company for this?

21   A    There is detailed profit and loss statements for each

22   facility for each year that support those.

23   Q    You have them back home?

24   A    I have them.  They were not submitted as part of the

25   subpoena.  The detailed reports behind those were not submitted

1   as part of a subpoena.

2   Q   And who made that decision?  Do you know?

3   A   It was done through myself, our legal department.  That's

4   what was --

5   Q   So when the subpoena called for the profit & loss

6   statement, independent costs, fees, you just did the summary.

7   Right?

8   A   That summary was intended to meet the first couple bullets

9   of the subpoena request.

10  Q   But these documents are available at your home office?

11  A   Yes.

12  Q   All right.  Now what about this third page?  I understand

13  the second page of this summary.  There was three pages that

14  had numbers on it in the stack there.  Right?

15  A   Yes.

16  Q   And Mr. LaMarca asked you about the second page, and that

17  has total revenue from '07 to '12, which was 188,445,628, but

18  because they backed out of some of 2007, he is using a number

19  of 148 million.  Are you aware of that?

20  A   Yes, sir.

21  Q   All right.  But those are all gross contract values.

22  Right?

23  A   Yes.

24  Q   Where is the summary that shows me the profit, the net

25  benefit that your company made for '8, '9, '10, '11, '12 for

1   these three facilities?  Did you do that summary?

2   A    I mean that's kind of where I see the fee line being the

3   net benefit to the company, because that would be our pretax

4   profit after applying an allocation of overhead.  So the fee

5   line is essentially the net benefit to the company.

6   Q    All right.  So stay with me for a second.  If I take the

7   fee line for Marshall County in '08, I have got 175,000

8   approximately.  Right?

9   A    Yes.

10  Q    And then I have got 264,695.  Right?

11  A    Yes.

12  Q    I would then deduct the 6774.  Right?  Because you lost

13  money?

14  A    Yes.

15  Q    If I was going to try to get a number of a net benefit for

16  each of these three and/or totally, it's a plus and minus deal.

17  Right?

18  A    It would be the sum of the profit for the years that were

19  requested.

20  Q    Right.  And so you have got 175,000 for '8; 264,000 for '9;

21  you are minus 6,700 for '10; you add 599,000; then you deduct

22  95,000.  Are we okay so far?

23  A    I'm following.

24  Q    And then down on East Mississippi, you have 434,000 profit,

25  then $2.7 million profit, 2.6 million profit.  You lose

1    290,000.  And in '12 you lose $5,039,696.  Right.

2    A    Yes.

3    Q    So that number has to come off of all of this net benefit

4    to arrive at whatever figure, and then you would add the fee

5    line down on Walnut Grove, the 877, the million and the 14.

6    Right?

7    A    Yes.

8    Q    And you didn't do that as a separate computation?

9    A    No.  That was not summarized.

10   Q    You could hit a button on the computer and get that,

11   though.  Couldn't you?

12   A    Yes.

13   Q    Do you know where is the authority -- let me see.  Where

14   are the authority board fees?  You had to pay authority board

15   fees up there, didn't you, at this facility?

16   A    If we had them, they would be probably rolled up into the

17   other operating expense line under professional fees.

18   Q    Probably, but we don't know if your program picked that up.

19   Right?

20   A    It most definitely picked up any expense that's there, but

21   drilling down into the line item to know if it's that

22   particular item, I have not done.

23   Q    Okay.

24        MR. COLETTE:  I think that's all I have of this

25   witness, Your Honor.  Thank you, Mr. Tyrrell.

1          THE COURT:  Mr. Tanner?

2                    **CROSS-EXAMINATION**

3    BY MR. TANNER:

4    Q    Say your last name for me again.

5    A    Tyrrell.

6    Q    Now, Mr. Tyrrell, out of this big stack of documents that

7    the court has taken up that's been marked for identification as

8    Exhibit 1, the only three documents that you can answer

9    anything about for us specifically are these three financial

10   pages?

11   A    Those three are the pages that I personally prepared.  I'm

12   familiar with the other documents.

13   Q    Okay.  When you say you're familiar with them, when did you

14   become familiar with them, sir?

15   A    I probably reviewed them within the last -- I mean I

16   reviewed them all in detail prior to coming here to make sure I

17   was a little more familiar with them, but basically I saw them

18   shortly after our accounts payable group pulled them.

19   Q    Okay.  And when your accounts payable pulled them and gave

20   them to you, was that prior to or after you had compiled your

21   charts here?

22   A    It was after I had compiled mine.

23   Q    Okay.  So you didn't look at those numbers and see if they

24   affected your chart in any way?

25   A    No.  These -- the consulting fees that were paid out are

1    part of overhead.  They are not booked at the facility level.

2    Q    Okay.  I don't think you have told us yet, sir.  When did

3    you start working with GEO in this capacity?

4    A    Well, I have been with the company just shy of 18 years.  I

5    have been in my current role for nine.

6    Q    Okay.  And prior to that, what were you doing?

7    A    Prior to that, I was a business manager at two of our

8    different facilities, spent about four or five years doing

9    that.  And then prior to that, I did accounts payable, fixed

10   assets and accounts receivable.  So I worked at various places

11   around our corporate office and at a couple of business units.

12   Q    Okay.  And for the last nine years, you have had the

13   position you currently hold?

14   A    I think I started at the corporate office.  When I

15   transferred back, I was a manager and have been promoted to

16   director but it's been similar responsibilities for that

17   period.

18   Q    Okay.  And what year was that just to be sure?

19   A    2007 is when I transferred back to the corporate office.

20   Q    Okay.  Now, sir, the numbers you put in your chart, the

21   chart that -- for the benefit of the record, the chart that has

22   at the bottom right-hand corner a date that says 5-18-2016?

23   A    Yes.

24   Q    All right.  On that spreadsheet, sir, each column that you

25   have under each of the three contracts or M.D.O.C. facilities,

1   those are done in calendar year terms.  Right?

2   A    Yes.

3   Q    Tell us when your company hired Mr. McCrory to be a

4   consultant.

5   A    Based on the agreements in here, I think it was 2008.

6   Q    2008.  When did your contracts with the State of

7   Mississippi begin, sir?

8   A    The Marshall County contract started long before that,

9   probably goes back to the late nineties.

10  Q    Okay.  So you had contracts with M.D.O.C. well before Cecil

11  McCrory ever got involved with your company.  Is that fair?

12  A    I believe that's correct.

13  Q    Who was the Mississippi Department -- who was the

14  Commissioner of M.D.O.C. when your company started getting

15  these contracts, sir?

16  A    I do not know.

17  Q    Do you know how long Mr. Christopher Epps has been the

18  Mississippi Department of Corrections Commissioner?

19  A    Unfortunately, I do not.

20  Q    Okay.  Do you know how long he has worked there?

21  A    No.

22  Q    How did your company -- now, I want to go back to the

23  subpoena.  Sir, I'm going to put the subpoena back up on the

24  Elmo here.  Is this the subpoena, sir, that you responded to?

25  I'm showing you the first page.  And now I will show you the

1  second page.  I think you have been referring to bullet points
2  A through D?
3  A   Yes.
4  Q   Have you ever -- is this your first time ever responding to
5  a subpoena to produce records that you received from the
6  federal government?
7  A   Yes.
8  Q   This is the first time?
9  A   First time I have, yes.
10 Q   So it wouldn't be a surprise to you to see one this short?
11 A   I don't have a point of reference, so --
12 Q   Did you and your lawyers -- well, I'm not asking you how
13 they talked to you or what they advised you, but when you all
14 were putting this together, did you try to comply with what the
15 government asked you to do?
16 A   Based on this, I believed we were.
17 Q   Okay.  And you all didn't in any way limit the government
18 on what they could have asked you for.  Is that fair?
19 A   No.  I'm not aware of any limitations.
20 Q   And the same way the government asked you for a profit and
21 loss statement and you produced that, had they asked you for
22 the underlying documents, you would have had to produce that as
23 well.  Right?
24 A   Not to my knowledge.
25 Q   Okay.  You would not have produced it?

1  A   If they had asked for additional detail, I'm sure we would

2  have provided it.

3  Q   Right.  Just like y'all provided everything they did ask

4  for?

5  A   Yes.

6  Q   Can you explain to the court why the government is relying

7  on you and just taking a summary of what you say happened as

8  opposed to looking into these numbers themselves?

9  A   I can't speak to that.

10  Q   Okay.  Give us a list, sir, of what these indirect costs

11  are.  For example, under Marshall County, the 750,441 that you

12  list as overhead, tell us what that includes.

13  A   It -- basically our overhead departments consist of our IT

14  group, IT infrastructure-related costs, our software

15  applications that are used company-wide.  It includes our legal

16  department, our corporate human resources.  We have payroll

17  tax, business management, which covers finance and accounting,

18  covers our design group which manages any capital projects in

19  construction.  Just all of our different corporate groups.

20  Q   Okay.  Now, payroll tax, just to take that as one example,

21  you owe payroll taxes on each of your employees?

22  A   Yes.

23  Q   Including the employees at Marshall County?

24  A   Yes.

25  Q   All right.  So even though you call that overhead --

A    It's payroll processing, not payroll tax.  It is the
payroll people that process all the payroll checks.  Payroll
tax expense is part of the facility's personnel-related costs.

Q    Okay.  That's fair, but you did just say payroll tax.
Right?

A    I said payroll and tax.

Q    You said payroll and tax?

A    Yes.

Q    That's the part I didn't hear.  Thank you.  Now, as far as
you having these contracts that go well prior to 2007, had the
government asked you to produce records related to those
contracts, the ones that go back to the nineties, you would
have had to produce those as well, or would you have produced
those as well?

A    If they were requested, we would have.

Q    All right.  Give us the exact date that Cecil McCrory was
hired by your company in 2008, as you said.

A    Let me look for the consulting agreement.

Q    Now, you're looking for a consulting agreement that you
weren't familiar with until after you put your sheet together.
Is that fair?

A    I mean we have a standard format that's used, so I'm sort
of familiar with the document, but I have not seen his
particular agreement until this subpoena.

Q    Okay.  Let me ask you --

1    A    Looks like the first agreement was August 2008.

2    Q    August 2008.

3    A    That's based on the document here.

4    Q    August what 2008 was the effective date?

5    A    August 1st.

6    Q    August 1st of 2008?

7    A    Yes.

8    Q    All right.  Was that the date that the agreement was

9    executed or was that the date of the first payment?

10   A    Looks like the date -- the signatures are not dated, but it

11   looks more like the execution date versus the first payment

12   date.  Typically the payment would be the month following the

13   submission of an invoice under the agreement.  So if he started

14   providing services August 1st, the next payment would be

15   September for what he provided in August.

16   Q    Okay.  And you already had a contract in place at that

17   time?

18   A    With the State of Mississippi, we did, yes.

19   Q    Okay.  Now, in your figure for Marshall County, for East

20   Mississippi, for example, do you break out here for the court

21   so the court can see this whole bribe that got you these

22   contracts, do you break out the months January through August

23   so the court can determine which portion of this 2008 figure is

24   attributable in any way to some contract through a relationship

25   with Mr. McCrory?

1  A   We did not break it out, but monthly detail could be

2  provided to derive that specific period of performance.

3  Q   You weren't asked for that.  Were you?

4  A   No, we were not.

5  Q   And you have not given -- because you weren't asked for it,

6  regardless of what the defense here has gotten, you didn't

7  provide that to the government, so they don't even have a

8  breakdown of what was triggered or what happened after the

9  execution of your contract with Mr. McCrory?

10  A   2008 broken out preAugust and August forward was not

11  provided.

12  Q   Okay.  So if the court goes with a figure from 2008, we

13  have to go with your whole year calculation as opposed to the

14  date that Mr. McCrory took on this contract?

15  A   Well, I believe that he prorated the amount to come up with

16  5/12ths worth of the number presented here.

17  Q   Okay.  That's fair.  Now, as far as the contract is

18  concerned -- no, let's go back to 2008.  Now, you say prorated.

19  Right?

20  A   Right.

21  Q   Now, revenue isn't necessarily consistent throughout the

22  year.  Is that fair?

23  A   It can fluctuate.

24  Q   All right.  And all these figures can fluctuate month to

25  month to get you your total on the year.  Is that fair?

1    A    Yes, it can.

2    Q    All right.  Do you know if that happened here?

3    A    There is probably a little bit of month-to-month variance.

4    I mean you have got months that have more holidays which

5    generate more labor costs.  So it's going to vary.

6    Q    Okay.  And we haven't been given -- we, the defense nor the

7    government, has been given any documentation that would show

8    that.  Is that fair?

9    A    At this point, I do not believe so.  I know I haven't

10   prepared anything for that.

11   Q    Okay.  Who was your consultant prior to Mr. Cecil McCrory?

12   A    I don't know.

13   Q    You don't know?

14   A    No.

15   Q    Did you have one?

16   A    I do not know.

17   Q    Does GEO make it a practice since -- you operate

18   nationally, right, on a national basis in your position?

19   A    Yes.

20   Q    All right.  Is it a common practice for GEO to employ

21   consultants in all the various states in which you operate?

22   A    Yes.  We often have consultants in various jurisdictions

23   where we do business.

24   Q    Okay.  And is it common for these people to apply for

25   positions with you?

1  A    I don't think it's very common.  If it is, I'm not aware of

2  that circumstance.

3  Q    Do you know who contacted who?  Did your group contact

4  Mr. McCrory, or did Mr. McCrory contact your group about

5  employment?

6  A    I do not know.

7  Q    All right.  If it was your group that contacted

8  Mr. McCrory, who suggested that you contact Mr. McCrory?

9  A    I have no idea.

10  Q    Now, in your capacity, you do a lot of complex financial

11  calculations.  Isn't that right?

12  A    Yes.

13  Q    All right.  Let's start with an easy one.  What's

14  40 percent of 10,000?

15  A    4,000.

16  Q    4,000?

17  A    Yes.

18  Q    All right.  So if you paid somebody, say, Cecil McCrory

19  $10,000 and he reported $10,000 on his taxes and he was charged

20  40 percent for that, he would have been left with 6,000.

21  Right?

22  A    Yes.

23  Q    Do you know how much he is alleged to have paid Mr. Epps

24  during the course of his contract on a month-to-month basis?

25  A    No.

1  Q    Okay.  Now, your company would not have paid Mr. McCrory

2  for work that he didn't do.  Isn't that fair?

3  A    That's probably a fair statement.  I mean I don't have

4  information related to what products or services he delivered

5  to us.  Working in the finance department, I don't have direct

6  relationships with our consultants.

7  Q    Does accounts payable fall under your finance department?

8  A    It falls under our chief financial officer, so it falls

9  under finance and accounting.

10 Q    Now, did Mr. McCrory not have to submit invoices to GEO in

11 order to get paid?

12 A    He did submit invoices, which is part of what documents are

13 provided in this exhibit.

14 Q    And would those invoices have gone to the finance

15 department prior to Mr. McCrory being paid?

16 A    They get submitted to our executive office, and then they

17 get sent down to accounts payable, and they are approved by our

18 comptroller or assistant comptroller.

19 Q    Okay.  So regardless of the chain, sir, my question is do

20 Mr. McCrory's invoices get to the finance department prior to

21 him being paid?

22 A    Finance department?  No.  They do not come to the finance

23 department.  They go to the accounting department.

24 Q    Okay.  And those are separate departments?

25 A    They both fall under our chief financial officer, but there

1   is two different groups.

2   Q   All right.  Did your company ever quarrel with the amount

3   of work that Mr. McCrory invoiced you for?

4   A   I don't know.

5   Q   All right.  You didn't look at that in your accounting

6   system or whatever you printed this document from?

7   A   I mean our accounts payable system isn't going to flag a

8   dispute on an invoice or something.

9   Q   Okay.  But you could have pulled invoices that Mr. McCrory

10  sent.  Right?

11  A   Invoices were pulled.

12  Q   Is that all of them?

13  A   I think it's all the ones that they had in the system.

14  Q   But you wouldn't know because you didn't pull them.  Right?

15  A   Yes, they are pulled by our accounts payable manager.

16  Q   You did not pull them?

17  A   I did not personally pull them.

18  Q   Okay.  Now, as far as Mr. McCrory is concerned, what

19  percentage of these 5,000 and then $10,000 checks, what

20  percentage of these checks did Mr. McCrory put in his own

21  pocket at the end of the day?

22  A   I have no idea.

23  Q   Now, tell the court, I mean, because Mr. McCrory was

24  initially getting $5,000 a month from your company.  Isn't that

25  fair?

1    A    Yes.  That's accurate.

2    Q    And at some point, that $5,000 figure was raised to

3    $10,000.  Is that fair?

4    A    Yes.  Looks like that increase corresponded with our

5    acquisition of Cornell Company, so we had an additional

6    contract in the State of Mississippi.  So it would appear that

7    there was a slightly broader scope of --

8    Q    Who asked for the invoice?  Did you offer the invoice?  You

9    meaning GEO.  Did GEO offer the increase on its own, or did

10   Mr. McCrory request an increase?

11   A    I don't know.

12   Q    But y'all printed out the letter where you offered him an

13   increase.  Right?

14   A    I have seen the letter.  I believe it was signed by Wayne

15   Calabrese.

16   Q    Okay.  Well, good.  Look at it again for me.

17   A    Referring to a letter dated September 2nd, 2010?

18   Q    Is that the letter where he gets the $5,000 bump?

19   A    Yeah, increase fee to $10,000 effective October 1st.

20   Q    Are you all offering him an increase or is he asking you

21   for an increase?

22   A    I mean I don't know the conversations that occurred prior

23   to the letter, but it appears to be a request for increased

24   services resulting in an increase in fee.

25   Q    You don't know those conversations and you don't even know

1    if Mr. McCrory had such a conversation.  Is that fair?

2    A   No, I'm not involved in that particular process of engaging

3    and managing our outside consultants.

4    Q   And you also don't know if, say, Mr. Epps got y'all to

5    offer that increase in salary or in consulting fees?

6    A   At this point, I do not.

7    Q   Is there anything at your office that you can tell us that

8    would help substantiate what this document that you produced

9    means?

10   A   I mean the financial documents consist of summarized

11   financials prepared which are normally accepted accounting

12   principles.  I mean they are -- individual facilities don't get

13   audited but our financial statements are audited and filed

14   publicly.

15   Q   Mr. McCrory had no ability to hire and fire you all or

16   grant or deny you all contracts.  Did he?

17   A   In his position, I don't know what his authority was.  I'm

18   here to support the financial information that we provided.  I

19   am not here to answer questions about contract.

20   Q   You are here to answer what I ask you unless the court

21   tells me otherwise.  Now, as far as -- so let's take that for a

22   second.  You are just here to answer the documents about these

23   three pieces of paper.  Is that fair?

24   A   That's why they requested I come down here.

25   Q   All right.  For these three pieces of paper?

A    For the packet.  I mean I'm comfortable with the accounts

payable documents.  I'm familiar with the consulting agreement.

So I can speak to our accounts payable process.  I would view

it as not limited to those three pages.

Q    These contracts you have got, sir, who got them for you?

What process did you go through to get your contracts with

these facilities in Mississippi?

A    The process of getting the contracts?

Q    Yes, sir.  You included the contracts in your packet.

         MR. LAMARCA:  Your Honor, if I might object at this

point, the court asked counsel to question the witness with

regard to the predicate for the financial records.  We were not

asked to go into who acquired the contracts, whether -- and at

what basis these contracts were acquired.  None of that was

requested of the court.

         THE COURT:  I will put a pin on that area and I will

come back to that.  All right.  Ask some more questions about

the predicate for the documents.

         MR. TANNER:  Yes, Your Honor.

BY MR. TANNER:

Q    Now, these numbers, are you looking at this -- these

revenue figures in this chart you put together?

A    This one?

Q    Yes, sir.  The one you're here to answer.  Those three

pages?

1   A   Yes.

2   Q   Let's go to Marshall County.  Are you looking at Marshall

3   County?

4   A   Right.

5   Q   In 2007, how much revenue did you report that you got from

6   the State of Mississippi?

7   A   11,191,431.

8   Q   That's 11,191,431.  Is that fair?

9   A   That's the revenue number, yes.

10  Q   Okay.  And at that point you didn't have Mr. McCrory

11  working for you.  Is that right?

12  A   Not that I know of.

13  Q   Is that right?

14  A   I believe so.

15  Q   And in 2008, once you hired Mr. McCrory, regardless of when

16  the fluctuations occurred in your month-to-month expenditures,

17  you all's revenue didn't increase that much.  Right?

18  A   Not at Marshall County.

19  Q   All right.  What about in 2009 in Marshall County?  Your

20  revenue didn't increase that much from '08 to '09.  Did it?

21  A   No.

22  Q   Okay.  What about from '09 to 2010?  It actually went down

23  then.  Right?

24  A   Yes. it did.

25  Q   All the while Mr. McCrory is working for you.  Is that

1  fair?

2  A    That is fair.

3  Q    Now, did the scope of your contracts ever change in terms

4  of what you all were assigned to do for these different

5  facilities?

6  A    Marshall County I think was pretty stable during the whole

7  time, but at East Mississippi there was an expansion that

8  activated in 2009.

9  Q    Okay.  And when you say expansion, do you mean the size of

10  the --

11  A    Increase in facility capacity, increase in the overall

12  contract and number of beds that we managed.

13  Q    Okay.  Who authorized that increase in the facilities?

14  A    It had to be done through some state administrative

15  process, through the legislature or depending on what the

16  authority is of the various agencies.

17  Q    A legislature or commission?

18  A    Whatever the appropriate governing authority is.

19  Q    Okay.  Now, who was it -- y'all don't -- GEO doesn't work

20  for M.D.O.C. anymore.  Does it?

21  A    Not anymore.

22  Q    As of when?

23  A    As of looks like the third quarter of 2012.  It was August

24  or September of 2012.

25  Q    Okay.  And at that point how did -- did y'all withdraw

1    y'all's services from the State of Mississippi voluntarily, or

2    how did that work?  Or were y'all fired?

3    A   I really don't know.  I think the situations may be

4    different at each of these three contracts.  I think we -- I

5    don't know.  I would have to -- you would have to request the

6    correspondence from the company or something, because I don't

7    know.

8    Q   Is Wayne Calabrese -- or how do you say his name?

9    A   Wayne Calabrese.

10   Q   Calabrese?

11   A   Yes, sir.

12   Q   And that's C-A-L-A-B-R-E-S-E?

13   A   C-A-L-A-B-R-E-S-E, yes.

14   Q   Now, Mr. Calabrese, is he still with GEO?

15   A   He is no longer employed by the company but he is a

16   consultant.

17   Q   In what state?

18   A   He actually spends more time on international projects at

19   this point, but he is -- I am not sure what he has worked on

20   domestically.

21   Q   Okay.  The whole time that this chart reflects, this 2007

22   through 2012, what was Mr. Calabrese's responsibility with your

23   company?

24   A   He was the chief operating officer.  His primary function

25   was business development, but he --

1    MR. LAMARCA: Your Honor, I'm going to object. This

2    has nothing to do with the figures that are listed here as far

3    as the reliability of these figures in getting to the net

4    benefit of these contracts.

5    THE COURT: I'm going to hear the answer to this one.

6    Go ahead.

7    BY MR. TANNER:

8    Q   Mr. Calabrese during this 2007 through 2012 that was shown

9    in your diagram or your chart, excuse me, what was

10   Mr. Calabrese' position with GEO?

11   A   He was the president and chief operating officer until his

12   retirement, which I want to say was '11 or '12, but he retired.

13   Q   '11 or 2012 he retired from the company?

14   A   I believe so.

15   Q   And now he works as a consultant for GEO?

16   A   Yes.

17   Q   And he, Mr. Calabrese, is the gentleman who increased GEO's

18   consulting services in Mississippi and thereby increased the

19   fee to Mr. McCrory to $10,000 per month. Is that right?

20   A   He is the one who prepared the letter or submitted the

21   letter.

22   Q   Okay.

23   MR. TANNER: Your Honor, may I have a moment to confer

24   with my client?

25   THE COURT: Go ahead.

```
1       (SHORT PAUSE)

2             MR. TANNER:  Your Honor, I pass the witness.

3             THE COURT:  Okay.  I believe Mr. Waggoner is not

4   involved in this.  Is that correct?

5             MR. BAIN:  That's correct, Your Honor.  I have no

6   questions.

7             THE COURT:  Any redirect here?

8             MR. LAMARCA:  Yes, Your Honor.
```

**REDIRECT EXAMINATION**

```
10  BY MR. LAMARCA:

11  Q   Mr. Tyrrell, if you will look at your accounting pages

12  again, those are the three pages that you generated.  Is that

13  right?

14  A   Yes.

15  Q   The rest of these documents you became familiar with by

16  reading them just like anybody else would.  Is that right?

17  A   Yes.

18  Q   Do you have anything with the negotiation -- to do with the

19  negotiation of those documents?

20  A   No.

21  Q   With the creation of those documents?

22  A   No.

23  Q   So all the questions asked of you about the genesis of

24  those documents, the contract, the consulting agreement, is

25  outside of what you know.  Is that right?
```

1   A    That's right.

2   Q    Now, when you said that you assigned particular overhead

3   percentage to a various facility here, to a particular year, do

4   you remember talking about that?

5   A    Uh-huh.

6   Q    And in that regard, you take the entire overhead for the

7   company and then just distribute it over the facility based

8   upon gross revenue.  Is that right?

9   A    Yes.

10  Q    That had nothing to do with the direct costs of operating

11  that facility.  Did it?

12  A    Correct.

13  Q    Nothing.  Right?

14  A    Yes.  It had nothing to do with direct operating costs for

15  the facility.

16  Q    Now, secondly, it was asked of you that all you had to do

17  was hit a button and you could have gotten all of these totals

18  at one time.  Right?

19  A    Multiple reports, because you have got to run it for each

20  facility for different years.

21  Q    If you wanted to know the total revenue of these three

22  facilities, a calculator would give you that, too, based upon

23  the document you have in front of you.  Right?

24  A    Yes.

25  Q    And you could easily take 5/12ths of 2008, a time period

1   which began the consulting fee, and determine based on 2008

2   from August 1 of 2008 what would be attributable to any fee or

3   any expense of the company or any revenue of the company after

4   it entered that consulting fee arrangement with Mr. McCrory's

5   company or Mr. McCrory himself.  Correct?

6   A   It's not likely to be materially different if you prorated

7   it versus looking at the specific months.

8           MR. LAMARCA:  Those are all the questions I have, Your

9   Honor.

10          THE COURT:  Okay.  You can step down.

11          THE WITNESS:  Thank you.

12          THE COURT:  Hold it.  You can stand right here.  With

13  regard to -- have a seat back up there again so you don't feel

14  uncomfortable.  With regard to this financial data, you just

15  hit a button on the computer to generate this?

16          THE WITNESS:  Yes.

17          THE COURT:  This report is not a normal report that's

18  provided in your regular course of business.  Is it?

19          THE WITNESS:  The report that supports the summary

20  that I prepared is a report that we use on a monthly basis to

21  review facility performance.  So the report that -- the

22  underlying report is a routine report that we use all the time.

23          THE COURT:  You said underlying report.

24          THE WITNESS:  Yes.

25          THE COURT:  What I have up here, is that the

1  underlying report?

2          THE WITNESS:  No.  It is the summary.

3          THE COURT:  This summary then is not something that

4  you use in your everyday activities?

5          THE WITNESS:  Not routinely.

6          THE COURT:  So then obviously with a summary you base

7  it on some specific data that your computer then totals and

8  generalizes?

9          THE WITNESS:  Yes.

10         THE COURT:  But the document that you prepared here is

11 a document that was prepared strictly in answer to the

12 subpoena.  Is that correct?

13         THE WITNESS:  Yes, it is.

14         THE COURT:  So the backup information is all in the

15 computer?

16         THE WITNESS:  Yes.

17         THE COURT:  And did you have anything to do with the

18 inputting of that information into the computer?

19         THE WITNESS:  No, because -- not to get into too much

20 detail, but we have a department that does accounts receivable,

21 we have a couple staff that do fixed assets.  So the individual

22 pieces of data that roll up, the payroll data, the accounts

23 payable data for utilities, there is different groups that

24 support those different areas.  Accounts payable doesn't manage

25 the revenue number.  Accounts payable doesn't manage the

1    payroll number.  But they are the ones that cut the checks for

2    the utility bills.  So the whole department has some piece of

3    the process in building up the consolidated financial numbers

4    you see in front of you.

5            THE COURT:  But wouldn't the accounts payable be

6    important to know with regard to the financial structure and

7    picture of the corporation?

8            THE WITNESS:  I'm not sure I follow the question.

9            THE COURT:  Well, wouldn't the accounts payables be an

10   item which should be included within your financial report so

11   as to provide information to any observer to know the financial

12   strength of the company?

13           THE WITNESS:  I mean accounts payable, they -- I mean

14   they don't do the financial reporting.  A financial reporting

15   group does the external reporting and does our SEC filings.

16           THE COURT:  But accounts payables would be accounted

17   for on your --

18           THE WITNESS:  The cost of managing the accounts

19   payable would be part of that overhead line item.  It is an

20   overhead department, and it would be part of that overhead

21   allocation that's on that summary.

22           THE COURT:  Okay.  Now, this summary that you provided

23   is a gross summary?

24           THE WITNESS:  It's -- I mean by gross, I mean I guess

25   with the revenue-related questions, if there are deductions

1 from the M.D.O.C. for staffing vacancies or something, the

2 numbers on that report would be net revenue, but it would be

3 the gross amount we received from the Mississippi Department of

4 Corrections.  So it's the total paid to us by the Department of

5 Corrections.

6    THE COURT:  And with regard to the underlying data,

7 how voluminous would that be?

8    THE WITNESS:  It would be incredibly voluminous if you

9 wanted to get into the individual payroll records as far as

10 timecards for the individual employees for the periods being

11 presented.  It would be incredibly voluminous.

12    THE COURT:  What do you mean by incredibly?

13    THE WITNESS:  Over the course of that period of time,

14 there is probably -- depending on what turnover was, there

15 could be a thousand different employees that you have got to

16 pull payroll records for every -- basically a payroll is

17 biweekly.  If you wanted to get down to the timecard, you would

18 be talking about hundreds of timecards for every two-week

19 period that would need to be compiled to support the total

20 payroll cost.

21    THE COURT:  Now, who actually ran this information

22 off?

23    THE WITNESS:  Well, I ran the reports, and the reports

24 consist of all the data fed into it from the other systems,

25 from accounts payable, accounts receivable.

        THE COURT:  So you are the one who went over to the computer and pulled the numbers?

        THE WITNESS:  Yes.  I went from my desk, ran the reports, put them in Excel and created that summary.

        THE COURT:  And did that computer already have a program for this, or did you create one?

        THE WITNESS:  I didn't have to create a program.  I mean our system -- the reports were run out of the Hyperion system which has a function to export them to Excel.  They were put into Excel and then summarized.

        THE COURT:  So walk me through how you actually went over to the computer and got this information.

        THE WITNESS:  So I logged into the system.

        THE COURT:  Okay.

        THE WITNESS:  We have a report that's called a management report, a P&L.  You select a report and then you select what facility you want to run.

        THE COURT:  Now, hold up.  When you say select a report?

        THE WITNESS:  I would select the management report, the profit and loss statement.

        THE COURT:  Okay.  You selected a profit and loss statement for what?

        THE WITNESS:  So I select a report, and then when you select a report, you have to pick what facility you want to run

1    it for.  So I could run it for Marshall County, East

2    Mississippi, Walnut Grove or South Bay Correctional Facility in

3    Florida.

4            THE COURT:  So then you said you wanted a profit and

5    loss statement?

6            THE WITNESS:  So I picked the profit and loss

7    statement report, selected the facility, so I started with

8    Marshall County.  So I selected Marshall County as the

9    facility, and then you select the data set you want to run,

10   because if I wanted to look at the budget, I could run a

11   budget.  I could look at the forecast.  So I picked actual as

12   the data that I want to run.  And I pick the time period, so I

13   would pick the year.  And in this case, I ran the full year.  I

14   could run a particular month, a particular quarter.  So I

15   picked Marshall County, 2007, actual full year and execute the

16   report, and it comes up with that facility's detail.

17           THE COURT:  And that's for the full year?

18           THE WITNESS:  For the full year.

19           THE COURT:  Then you did it for the next year.

20           THE WITNESS:  And then I did it for the next year and

21   the next year.  So I did that for each facility to get all the

22   data for the years that were requested.

23           THE COURT:  Now, did you have to have help from

24   someone?

25           THE WITNESS:  No.

1          THE COURT:  So you could do all of that yourself?

2          THE WITNESS:  In this case, I did the entire thing

3    myself.

4          THE COURT:  Is this something that you normally do?

5          THE WITNESS:  We get -- I mean depending on what

6    operations is requesting.  I mean we get different kinds of

7    requests.  Sometimes we are compiling medical cost data.

8    Sometimes it might be food service.  This isn't the most common

9    kind of request for historical data going back this far, but I

10   mean we have the reports that already exist to provide the

11   data, so there is nothing -- nothing that we had to create or

12   nothing extraordinary that we had to do to pull the reports to

13   provide this.

14         THE COURT:  So all these categories were already --

15         THE WITNESS:  Those are the categories that we use --

16         THE COURT:  All the categories were readily available

17   on the computer?

18         THE WITNESS:  Yes.

19         THE COURT:  You didn't have to create anything?

20         THE WITNESS:  Yes.  The expenses are already broken

21   out into those categories.  In the case -- an example, in the

22   case of the personnel and related costs, I combined direct

23   labor and taxes and benefits into that one line.  But direct

24   labor, benefits and payroll taxes are roll-ups on the report

25   that we use.

1          THE COURT:  Okay.  Now you had said before this is

2   something you normally do?

3          THE WITNESS:  When we would get a request like this, I

4   would expect it to come to me to complete.

5          THE COURT:  You have gotten other requests?

6          THE WITNESS:  Not like this, but if some member of

7   management is looking at a particular facility and they want

8   some historical financials, that kind of stuff comes through me

9   or my group.  In this case I compiled that without any outside

10  assistance.

11         THE COURT:  Okay.  Is there anything you need to add

12  to this in order to give a compete picture?

13         THE WITNESS:  I believe that paints a complete picture

14  for those three facilities.  I don't really have anything to

15  add.

16         THE COURT:  So then this figure here at the bottom of

17  188 million, etcetera, that represents what?  It says total

18  revenue at the top.

19         THE WITNESS:  That's the total revenue received by GEO

20  from the Mississippi Department of Corrections for the periods

21  presented.  Unfortunately, I don't have the historical

22  information for Walnut Grove, so the Walnut Grove total is

23  incomplete, which I mentioned earlier.  We acquired Cornell

24  Companies, and we didn't have the preacquisition detail to

25  submit with the subpoena.

THE COURT: Okay. You have a footnote over on the preceding page that says Walnut Grove was a facility acquired in 2010. Preacquisition data is not available.

THE WITNESS: Right. That's what I was just saying, that the historical Walnut Grove data was not available.

THE COURT: Did you add this footnote?

THE WITNESS: Yes, I did.

THE COURT: Based on my questions, are there any additional questions?

MR. LAMARCA: No, Your Honor.

MR. COLETTE: No, Your Honor.

MR. TANNER: Not from Mr. McCrory, Your Honor.

THE COURT: All right. You can step down.

THE WITNESS: Thank you.

THE COURT: Mr. Colette, what is your motion with regard to -- I mean what is your argument after this examination with regard to your request for a continuance?

MR. COLETTE: Well, I think, like this witness like every other one I anticipate him calling, he said he was going to call 10 20-minute witnesses, I believe Rule 1006 provides that you can use a summary chart if it's a lot of documents, but the proponent must make the originals or duplicates available to ascertain whether these costs were included or not. And again, even what you just heard, Judge, that's all great, but that 188 million, 148 million, those are red

1    herrings.  That's not even the number we are looking for.  What

2    we are looking for is the net benefit.  And that's why you

3    would have to take -- and the argument is going to be -- I can

4    anticipate it right now.  Here is the argument just with

5    respect to GEO.  The number we're looking for is net benefit as

6    a result of the bribe, a bribe between Cecil and Mr. Epps with

7    respect to GEO.

8           First of all, there was no bribe in this contract.

9    The consulting fees that Cecil got probably were split with

10   somebody who is not named.  And that, we wouldn't be able to

11   do.  The second thing is this, Judge.  As you just saw, the

12   government reads *Landers* a little differently than I read it,

13   and obviously we are both going to rely on how you read it.

14   And that is when I took them to 2008 and I said tell me what

15   was your profit for 2008, and he said 175,000, because you

16   deduct the overhead.  And they assigned a percent of the

17   overhead.  And Darren got up on redirect and said for the whole

18   company, because *Landers* says that you can deduct indirect

19   costs if it's assigned to a specific or if it's identifiable to

20   a specific contract.

21          So I renew my objection with respect to the 1006 not

22   having any supporting documents other than this summary.  And

23   the same objection is going to hold true with all the rest of

24   these.  You know, we sat here while we were doing it and tried

25   to discern or come up with cross-examination from a summary

chart.  And this witness didn't know if the back-offs -- in other words, if they had a contract with M.D.O.C. to provide a thousand people but they only had 500, then the Commissioner wouldn't approve that, so they had to back those charges out of this revenue.  He couldn't tell us that.  He assumed it was there.  He has got the documents, but he interpreted the subpoena not to require them.

And again, earlier the government keeps saying we could subpoena it.  Judge, I'm ready to go to sentencing tomorrow with the presentence report as written.  The government has the burden if they want to now try to convince you to use an alternative method under 2C1.1 which is really the only issue we are here about.  They want to try another alternative method.  Athena, the U.S. Probation Department has a printed prepared presentence report that lists all of those contracts, 868 million.  Now what we saw today is we saw some change.  They had a $19 million figure in the presentence report, but now it's really 148 million.  But really when you get down to it, it's 2 million, because you net it out.

So they want you to use -- don't use the 1.4 million, the 14-level enhancement; use some other number that we're going to have to spend a year to try to determine.  And I submit to you that the case law says that you have to make a reasonable estimate on loss although this is not really a loss.  And 2C1.1 says it doesn't have to be exact.  And that you have

got that.  Two of the four ways -- two of the four alternative
approaches under 2C1.1 you have that's not even in dispute.
It's $1.4 million payment and/or the benefit he received is
$1.4 million payment.  What we don't have is the net benefit,
if that's the proper term, that these companies received
because of or based on the bribe.  So you're going to have to
have all these companies come up in here and talk about their
net benefit, what's deducted, what's included, what's not
included.  Then they have to prove that contract, this GEO
contract, was only given as result of the bribe.  That's going
to be a little hard, especially since they have been doing
business with them since '95.

          So they say, Oh, we are just going to look at from the
time Cecil paid them, 2007.  Cecil doesn't get there until
August.  Okay.  We are just going to look at the amount from
August.  So it becomes a lot more complicated.

          I think back to my original request for the
continuance, so my request for a continuance was twofold.  One
is I have to have the documents if we have to go through this
extensive multi-facetted calculation; or two, I'm ready to go
for sentencing in July based on the presentence report as
written.  And that's exactly what probation did.  And what
probation said, if the court recalls, and I know the court has
read it, is where these numbers are too hard to find, the court
can look at what we've got and it can depart upwards or

downwards based on Footnote 7 to the guidelines.  And she clearly says that to you twice in this particular presentence report.

So, again, I think it's not so much of the contracts awarded.  The Fifth Circuit says it doesn't matter if it was 800 million or 10 billion.  What was the net benefit as a result of the bribe?  And I think computing that number or trying to arrive at that number, Your Honor, is going to take probably four or five more hearings.  And I think that it would be a waste of time and judicial economy, and I think the court has with it right now in the presentence report sufficient information to impose an appropriate sentence in this case.  Thank you.

THE COURT:  Mr. Tanner, are you joining in?

MR. TANNER:  No, Your Honor.  I was just -- I join in on his -- again, I join in on his motion to continue the hearing, but I don't know if the court wants argument.  I just had a brief argument about that document to the extent it would be noted as in evidence as opposed to just an item marked for identification, Your Honor.

I would argue, Your Honor, that they have not laid a proper foundation for showing that this document should come in as a summary.  On the one hand, they kept pointing out the fact that this gentleman was here only to testify about the three pages of the chart that he put together, and yet when they

offered it to the court, they offered the entire document.

So he testified specifically that he had nothing to do with the majority of the production other than those three pages. So we would argue that those additional pages should come out for that reason.

On the second point, as to those three pages themselves, Your Honor, they have not laid a foundation that shows that they should come in even as a summary. Your Honor, there has been no testimony that the underlying documents -- and I don't mean just the report. It doesn't matter how long the chain goes. The documents which underlie those reports, they have to put them in as a business record. Right? They have to show that these documents were kept, maintained, generated or what-have-you, you know, contemporaneously or at or about the same time by somebody who would have known what they are and why they were put in. This gentleman can't testify to that, and he didn't. And so this is not some case where we are looking at an indicia of reliability, Your Honor. We just scratched a tip of the iceberg, particularly if you go with the government's longstanding theory, which is that this whole thing was about a bribe and that's the only reason these people got involved in this case; and further that Mr. McCrory, I think my esteemed colleague, Mr. LaMarca, said earlier that it was a big windfall to him, insinuating he did nothing for the work. Well, if that is true, then we have to assume that

1 the people that paid this so-called bribe knew that it was a

2 bribe.  And, as such, they are -- they are incentivized to

3 minimize numbers, to hide the ball on numbers or to say the

4 numbers are something that they may not be.  So this does not

5 have the indicia of reliability for which we would just

6 normally dispense with the rules that require them to produce

7 the underlying documents.

8          And so, for that reason, Your Honor, we would ask that

9 all parts of that just be entered as for identification only

10 and not as evidence.

11          THE COURT:  All right.  Thank you.  Mr. LaMarca, what

12 about the objection as to this document being but a summary and

13 the defense's objection that a summary has to be -- has to have

14 supporting documentation?

15          MR. LAMARCA:  I would -- I would concede that, were we

16 in trial.  This is a hearing to determine sentence, loss

17 calculation.  The court is well aware that the rules of

18 evidence don't apply.  I do grant the court -- that the court

19 must find the evidence reliable, and that's the gravamen of

20 what we are doing here today.  Does the court believe that the

21 evidence presented was reliable?  Does the court have enough

22 information from the witness to determine that evidence was

23 reliable?  Not whether it passes the rules of evidence but

24 whether it is reliable.

25          The witness testified that he went through these

1    documents, gave the summary in compliance with the subpoena

2    that was issued requesting the information that this court

3    needs to arrive at the net benefit in this case.  We are here

4    to talk about the sentencing, the loss amount as it pertains to

5    net benefit.  I don't want to get lost in this word *loss*

6    *amount.*  It is the net benefit that the Fifth Circuit has said

7    we should strive to determine.  Strive.  And if we can

8    determine it with reasonable -- under a reasonable basis and if

9    it's higher than the 1.4 million in bribe amounts, then we

10   should use the net benefit in calculating the guidelines.

11       Each witness is here to testify as to the financial

12   data pertaining to that particular company, the gross revenue

13   and the net benefit based upon the instructions of the Fifth

14   Circuit.  This witness was here.  This witness relied upon

15   business records of his company.  As he said, where do you

16   stop?  I shouldn't say he said this, but he said if you drill

17   down deep enough, you would have voluminous records of just

18   timecards of employees, insurance payments, unemployment

19   benefit payments, all of that for the defense to determine

20   whether this dollar should have gone in this column or this

21   column.

22       These were records relied upon by this company

23   pursuant to the testimony to make company decisions on

24   profitability and on actions based upon this company's

25   financial condition.  And that financial condition was

1    determined by this witness.  In other words, as this court has

2    said so many times, even for a jury trial, if they would rely

3    on this in their most important affairs, that would rise to the

4    point of being beyond a reasonable doubt.  And in this case,

5    this witness testified that he took these numbers from their

6    profit and loss statement strictly to comply with the subpoena

7    as issued in an attempt to get this court the information it

8    needs to get a guideline calculation based on net benefit or

9    based on the bribe amount.  And that was the effort made, and

10   that is what this witness came to testify to in compliance with

11   this subpoena.

12        Is it sufficient?  Is it reliable?  I submit to the

13   court it is and that each and every person who is here to

14   testify can do so in the same manner that the court has heard

15   through the testimony of Mr. Tyrrell.  Thank you.

16        THE COURT:  All right.  Thank you.  I'm ready to make

17   a ruling on this matter.  This court is uncomfortable with this

18   procedure as it is now crafted.  What I have before me would be

19   some summaries, some witnesses who would testify to those

20   summaries; but nevertheless, I have before me summaries that

21   have been submitted to the defense at the last moment,

22   witnesses who were not identified to the defense prior to

23   today.  The defense has had no opportunity to study these

24   records to determine how they wish to address those records,

25   whether they wish to probe further or in what direction.

        Defense was not provided the names of witnesses who
were supposed to be sponsors so the defense then would know
whether they are, indeed, prudent sponsors.  The defense then
may not have had enough opportunity to go over in detail with
their clients on these records.  So what we have here is some
material submitted to the defense at the last minute where the
defense is expected to craft a meaningful cross-examination
without any meaningful preparation for such.  The court is
uncomfortable with that proceeding.

        The defense should have time to study documents so
important to sentencing, time to determine if the defense
wishes to rely upon those documents or submit others in
conjunction with same or challenge those very documents.  This
court is not satisfied that production of these documents when
they were produced afforded the defense enough time to
carefully and prudently study these documents so that they
would be prepared to address these matters as the court wishes
them to do.

        So then the court is going to grant the motion for a
continuance.  I wanted to hear a witness before I made this
determination because this matter has taken some time.  This
matter has been continued on more than one occasion; but
nevertheless, each time the continuance has occurred, there has
been a justifiable reason for the continuance.

        At the last session when I set this matter for today's

1   date, I expected that the defense would have the documents and

2   that the defense would have these documents weeks before the

3   hearing.  I did not anticipate or expect that the defense would

4   get these documents mere days before this hearing.  The

5   prosecution advises me that it had just received these

6   documents.  The prosecution also said that at one point the

7   prosecution would not have objected to a three-week continuance

8   so the defense could study the documents but apparently

9   withdrew that agreement once the witnesses had been subpoenaed

10  to come here today.

11          So then what I'm hearing is that at first blush the

12  prosecution would not have opposed this continuance but only

13  did so because the prosecution had expended monies on the

14  travel of these witnesses.  So this court is going to grant a

15  continuance.  During this time period, the defense should be

16  afforded all of the documents.  All of the documents.  Next,

17  the defense, after studying those documents, should submit to

18  the court in writing what avenues the defense proposes towards

19  those documents.

20          For instance, the defense has asked about the

21  supporting documents for these summaries.  The witness said

22  that the supporting documents are voluminous.  Well then the

23  defense does not have to have these voluminous papers, but if

24  they would have some opportunity to view these on computers,

25  then they would not have to have it all reduced to papers.  So

1   then I think there are some other ways of determining what

2   documents in support that the defense might need, because there

3   is another option, and that is for them to travel to the

4   company and then to study the computer and be able to go to the

5   company and see the company representatives punch the buttons.

6          So there are other options to having just voluminous

7   papers submitted to the court or made available to the court or

8   to the defense; but regardless of which method is chosen, the

9   court feels that the defense is entitled to be able to verify

10  the accuracy of a summary.  The prosecution is correct that the

11  court does not have to follow the strict rules of evidence at a

12  sentencing, but, on the other hand, I think the point made by

13  the defense is telling; that out of fairness, defense out to be

14  able to challenge the documents or verify the credibility of

15  the documents and not be stuck with a simple summary.  Were

16  this a matter that was going to trial, then the prosecution

17  would have to have the underlying documents before someone

18  could testify as to a summary.  And even though that rule is

19  not necessarily binding on a court at sentencing, this court

20  feels that the defense ought to be allowed an opportunity just

21  as at a trial to get at a document's veracity.

22         Then there is another matter that concerns me.  I

23  asked at the top of the examination whether this company was a

24  target.  I have been told by the prosecution, quote, not at

25  this time, and that apparently the prosecution doesn't believe

that this company will be a target. I have no information to
say that this company is a target or will be a target, but then
I have heard Mr. Tanner in his cross examination where he wants
to, I believe, imply that maybe there is some criminal taint
with regard to this corporation or some other corporation. I
believe that before we go forward on just summaries without
cross-examination possibilities of those summaries that the
defense ought to be able to develop its entire theory as to
involvement of other people and mitigation of any matters
concerning the defendants here.

Another matter. I understand that some of the
companies are going to submit to the court a motion for
protective order. I didn't know that was coming. I would like
to have the motions for protective order, and this is directed
at the government, the motions for protective order filed, and
then I will review those motions first of all in camera so I
can understand what is the thrust of the motion and then
thereafter hold a quick hearing on the motion for protective
order.

The law allows protective orders to be filed and
granted when information divulged in open court would prejudice
irrevocably some party. Just because a company doesn't want
its finances revealed is not enough for a protective order.
The basis for protective order has to be greater than that. At
this juncture, I simply have been notified that some companies

1  want a protective order.  I don't know the names of those

2  companies.  I don't know what business they are in.  I don't

3  know if the protective order is supposed to be based upon some

4  competitive edge that might be destroyed if some information is

5  divulged in open court.

6          So what I want then is a motion for a protective order

7  to be submitted in writing with the grounds for such.  I will

8  read it and then make a determination after I have determined

9  the position of the parties with regard to same.

10          Then with regard to these companies, these 15

11  companies that are expected to testify, the names, positions of

12  the alleged sponsors for the documents to be submitted to the

13  court should be provided to the defense along with a paragraph

14  as to why those individuals are appropriate sponsors.  Of

15  course, all of this will be filed so the court can review it

16  itself.  So these are the matters that I think that must be

17  addressed prior to the court going further.

18          Now, we started off at one point with 300 or

19  500 million, and now we are at 800 million.  I ask the

20  prosecution will there be any other suggestions for an

21  increase?

22          MR. LAMARCA:  Your Honor, the only increase would be

23  these figures -- the $800 million figure was based upon the

24  contracts that were let.  The only difference that the court

25  may hear could be the actual revenue pursuant to those

1  contracts which may be larger or smaller to some degree than

2  the actual face value of that contract. And that may be due to

3  circumstances that the company can testify to as to why those

4  figures are different. But the actual revenue to give the

5  court a clear picture of what they actually earned through

6  those contracts may, in fact, be different than the total

7  figure that the court had seen in the PSR.

8  THE COURT: Okay. Next question. Mr. LaMarca, if we

9  had proceeded today, we probably would have heard some names of

10  persons who have not been indicted at this point. Is that so?

11  MR. LAMARCA: You may have based upon the court's

12  ruling that you would allow the defendants to get into

13  mitigation testimony today.

14  THE COURT: Then, when we return, will that

15  circumstance be the same? That is, do you anticipate that when

16  we come back that those persons will still be unindicted or by

17  that time indicted?

18  MR. LAMARCA: We had initially, Your Honor, back I

19  want to say in April discussed this very issue and are going to

20  have that scenario concluded by July I think 19th, the date of

21  the actual sentencing. So based upon the court's ruling today

22  that defendants may be able to get into the mitigation as to

23  these contracts and to the value of these contracts, or I

24  shouldn't say value, whether the contracts pertain to this

25  scheme or not, I think that's my appreciation of it, and the

1  court's ruling that they will be allowed to do so, then that

2  would -- depending upon when the court wants to reconvene this

3  hearing, that would move up if it reconvenes it before

4  July 19th, the government's plan to have all these matters

5  concluded that would be affected by this case by that date.

6  THE COURT:  Now, let's talk about our schedule.  Mr.

7  LaMarca, by what date can you provide to the defense all of the

8  documents that the court ordered previously and may have to

9  order to supplement what has now been submitted?

10  MR. LAMARCA:  Your Honor, that would -- of course,

11  it's hard for me to say based upon the cooperation I receive

12  from each of the people that we subpoena to acquire this

13  information.  If we issue the subpoena returnable in two weeks

14  to obtain this information, it's going to be up to each

15  individual.  We can say bring it up with the court if you can't

16  comply with it in the manner that the subpoena is issued based

17  upon what the court has asked us to do at this point, and then

18  those individuals can make representations to the court whether

19  the subpoena should be quashed or limited in some fashion.  It

20  would be between the entity subpoenaed and this court.  So we

21  can issue the subpoena requesting this information for any date

22  that would be reasonable to get the backup documents from all

23  of these other companies to give them a reasonable time to do

24  it.

25  THE COURT:  I had put down on my notepad that two

1    weeks might be reasonable.  Now, you mentioned two weeks

2    yourself.  So do you think two weeks is reasonable?

3         MR. LAMARCA:  It would be to me.  I'm not the one

4    producing the documents and gathering those documents, but it

5    would be to me.  You know, each of these entities and these

6    companies, whether they can or can't in two weeks would be --

7    that would be their issue at that point, Your Honor.

8         THE COURT:  Let me turn to the defense.  I'm just

9    asking you now about the subpoena to the company, not about

10   your review time.  So with regard to the subpoenas to the

11   companies to produce documents, and during this time period

12   were you to meet with the prosecution and other defense

13   counsel, all of you all meet together to determine what method

14   will be most efficient in providing to you the needed

15   underlying information that you would have -- now I know some

16   would have to wait until you get all of the information, but

17   give me a proposed schedule on the production.

18        MR. COLETTE:  I'm not sure I'm clear.  If Darren says

19   he is going to issue subpoenas in two weeks --

20        THE COURT:  Issue subpoenas now to be returnable in

21   two weeks.

22        MR. COLETTE:  Okay.  The only caveat I have with that,

23   Judge, is Darren issued 15 subpoenas returnable for today.  I

24   have only received seven or eight submissions.  Now maybe they

25   have gotten some more or maybe there is reason why they didn't

comply with those subpoenas which would then cause me some
concern why would they comply again.  But assuming he has the
subpoenas, the documents returnable to him in the office within
two weeks and I get copies of that, we would need I guess two
weeks to review it.  It's not my burden.  Obviously it's his.
And I understand what he has on his attachment to the subpoena.
But I think as a suggestion, and I don't know if it's even
feasible, what would make my job easier in trying to ascertain
this number that we are all trying to find I think would be
something similar to where they have the line items of the --
because the gross contract value is not a number we really care
about.  It doesn't really apply.  It looks bad, huge, but the
court is not looking at that.  But to break it down with the
deductions from the gross, the allowable deductions, and Darren
and I may differ somewhat on that, but at least if there are
line items like with GEO and had a summary so I know with
respect to like Athena did in the revised presentence report on
26, with respect to the CCI company, the gross value is
whatever the net value or the net benefit is X, then I have got
a number to know what we are looking at.  You total up those
numbers and that's what gives the proposed guideline
sentencing.

                So I say all of that that if they could get the folks
to provide them with a more succinct document that's usable
here, what we are looking at, I mean copies of the contracts,

```
 1    we've got most of those.  You know, checks to Cecil, that's not
 2    my argument.  But I need at least I think to be a little
 3    cautious, I need two weeks after receipt of the documents.  But
 4    I have got to have full submission.  If I see something on the
 5    submission like when they gave me these documents and I only
 6    got one page, all right, I can send Darren an e-mail and say
 7    this is not getting it.  I have got to know how they came with
 8    that number.  And he says you have got the right to subpoena
 9    them people like everybody else -- I don't have a burden here.
10    They have got the burden.  I am fine with the presentence
11    report.  I want that clear.  Any other number the government
12    proposes to use, they have got to bring the folks here.  Not
13    me.  I'm happy with the number I have got.  But I need at least
14    two weeks to analyze whatever documents if I get compliance,
15    Judge, because I don't want to be back here again.  And on
16    several of these, I don't have anything.  I am not saying
17    Darren has them either.  I never alluded to that.  I don't
18    think some of these folks complied with it.
19           THE COURT:  Okay.  Other defense counsel, do y'all
20    have anything else you would like to add?
21           MR. BAIN:  Your Honor, as to us, again, we're very
22    limited in what we have.  I think that timeframe would be okay.
23    The question I have is Mr. Waggoner was subpoenaed as an
24    officer of CCI, so he is actually to comply with some of this.
25    And I don't know -- one of the reasons he has an accountant
```

1   that will be back, and I think we can get some of those

2   documents, but going with -- it's kind of twofold, going with

3   him to comply with the subpoena and then to review those, I

4   think we are okay with that timeframe, but I have some

5   questions that maybe I can clear up with Darren after court

6   about that.  But otherwise, I think we're okay.

7           THE COURT:  All right.  And Mr. Tanner?

8           MR. TANNER:  The question being how long would I need

9   to review it?

10          THE COURT:  Not review it.  I'm talking about the

11  production from the companies, two weeks.  I'm thinking about

12  ordering the subpoena to be issued returnable in two weeks.

13  And then thereafter, once you have acquired the documents, I

14  will talk about how much time you need for review.  Because

15  then I will know how much material has been produced and then

16  whether all of the material has been produced.

17          MR. TANNER:  Yes, Your Honor.  I thought at the

18  outset, Your Honor, and I maybe heard you wrong, I thought at

19  the outset defense counsel was supposed to get with Mr. LaMarca

20  and we kind of at least try to fashion what it might be that we

21  are looking for now that we have a place to start.

22          THE COURT:  But in the meantime, I want Mr. LaMarca to

23  subpoena the companies to make sure that the information that

24  he initially requested has been brought here.  Now, and the

25  backup stuff, whatever you might need, you can talk to him

1    about it trying to see if you can get that to see if you all

2    can work that out informally.  If not, then in two weeks when

3    materials are supposed to be here, I will address whatever

4    concerns you have.

5            MR. TANNER:  Yes, Your Honor.  In that case, I'm fine

6    with the two weeks.  I didn't recognize it was two-tiered.  I

7    get it.

8            THE COURT:  I'm just talking about the production at

9    this point, not the review.  Thank you.  So, Mr. LaMarca, can

10   you put those subpoenas together and reissue the ones that have

11   been issued that have not been complied with thus far and issue

12   any new subpoenas that need to be issued and get that out today

13   or first thing tomorrow morning?

14           MR. LAMARCA:  Yes, Your Honor, we can.  And we will

15   attempt to discuss with defense counsel as well to in this next

16   round of subpoenas to go ahead and get as much information as

17   they would require and as the companies can provide with the

18   backup documentation for these figures.

19           In addition, Your Honor, we had served several

20   subpoenas to individuals on behalf of companies and we have not

21   heard from, nor do we see the representative here today who was

22   served with that subpoena.  And we would ask for an order of

23   the court, a show cause order, to require those people or

24   those -- actually those people to appear before the court to

25   show cause why they should not be held in contempt should they

have some defense as to whether they were an actual

representative of the company or not.  We had reason to believe

that they were a representative of the company.  They were

served, yet it's my understanding that they are not present

today with any documents or individually to attend this hearing

as required by the subpoena.

THE COURT:  If you encounter any recalcitrant with

regard to these subpoenas, I would expect that the prosecution

would notify me immediately, because earlier, again at the top

of these proceedings, you said that there were 15 companies

that had been the recipient of subpoenas but that you were just

going to go forward today with 10, and I guess the other five

were to be submitted later.  But now you advise me that some of

these five did not respond?

MR. LAMARCA:  At all.  And we did not know whether

they would even be here today, and we do not see the

representative who was served here today.  And it's with regard

to two of those companies.

THE COURT:  All right.  This is the first time I have

known that.  I need to be advised of these developments as fast

as possible so we can keep this case on track.  So as soon as

you have some notion about recalcitrants, then I should be

advised so I can submit the appropriate order on that.  Of

course, you always have to advise the defense of these actions

so it's not ex parte.

MR. LAMARCA:  Yes, sir.  That was my attempt right now
to advise the court because they were returnable for today.

THE COURT:  Then submit to me the proposed show cause
order and I will sign it.

MR. LAMARCA:  Yes, Your Honor.  And that's on two of
the five, one being Admin Pros was not served.  The -- one of
the companies, Sentinel 4, G4S, G4S is a company operating out
of London, England, who is not amenable to the service without
the Office of International Affairs.  We will take whatever
efforts we can to accomplish that, but I advise the court and
defense counsel that that particular effort may prove fruitless
because of the timeframes that we are working on and the
government may end up not going forward with regard to the net
benefit on that particular contract, Your Honor.

THE COURT:  And how much is that contract?

MR. LAMARCA:  Approximately 2.6 million.  In gross.

THE COURT:  Okay.

MR. LAMARCA:  But I wanted to make defense counsel and
the court aware of that particular circumstance with regard to
that company.

THE COURT:  Okay.  Then draft me an order reflecting
what I have ordered today, show it to defense for their
approval as to form and content.

MR. LAMARCA:  Yes, Your Honor.

THE COURT:  All right, then.  After two weeks, we will

1   meet again.  Twana, give me a date two weeks from now so

2   everyone knows when we are supposed to recongregate.

3   June 23rd, 2016.  What time?  9:00.  At 9:00 a.m.  All right,

4   then.

5           MR. LAMARCA:  Excuse me, Your Honor.  And that

6   particular hearing will be to assess the status of the service

7   or actually the return on those subpoenas and where we are to

8   go from that point.  Is that fair?

9           THE COURT:  That's correct.

10          MR. LAMARCA:  Thank you, Your Honor.

11          THE COURT:  Let's see.  Maybe that's too close.

12  That's two weeks from now, and you want to make your subpoenas

13  returnable in two weeks.  Right?

14          MR. LAMARCA:  That is true.  Yes, sir.

15          THE COURT:  So I need another day or two after that,

16  Twana.

17     (SHORT PAUSE)

18          THE COURT:  The 29th of June.  June 29th at 9:00 a.m.

19          MR. LAMARCA:  Yes, Your Honor.  Thank you.

20          THE COURT:  All right.  We are adjourned.

21

22

23

24

25

1

2                    CERTIFICATE OF REPORTER

3

4        I, BRENDA D. WOLVERTON, Official Court Reporter,

5   United States District Court, Southern District of

6   Mississippi, do hereby certify that the above and foregoing

7   pages contain a full, true and correct transcript of the

8   proceedings had in the aforenamed case at the time and

9   place indicated, which proceedings were recorded by me to

10  the best of my skill and ability.

11        I certify that the transcript fees and format

12  comply with those prescribed by the Court and Judicial

13  Conference of the United States.

14        This the 10th day of June, 2016.

15

16                              s/ Brenda D. Wolverton_____
                                BRENDA D. WOLVERTON, RPR-CRR
17

18

19

20

21

22

23

24

25